ADVISORY OPINION ON CONSTITUTIONALITY OF 1975 PA 227

(QUESTION 1)

Docket No. 57850. Argued March 5, 1976 (Calendar No. 11).—Decided
March 29, 1976.

The Supreme Court granted a request by the House of Represent-
atives for an advisory opinion to review ten specific questions of
law concerning the constitutionality of 1975 PA 227 (Enrolled
House Bill 5250), an act to regulate political activity. In a per
curiam opinion by Williams, Coleman, Fitzgerald, and Lin-
demer, JJ., it was *held:* Public Act 227 of 1975 was unconstitu-
tionally enacted in violation of Const 1963, art 4, § 24, the
"title-body" clause, because it embraces more than one object.
This opinion was issued in order to inform citizens of the act's
unconstitutionality before its effective date; the Court intends
to issue a second opinion dealing with the nine remaining
issues.

Ryan, J., concurred in the conclusion that the act is unconsti-
tutional but dissented from the portion of the per curiam
opinion which stated an intention to issue a second opinion on
the constitutionality of the act. A determination of unconstitu-
tionality terminates the statutory life of the act and there
remains no legislation on which to issue an advisory opinion.

Levin, J., with whom Kavanagh, C. J., concurred, dissented
on the grounds that the stated object of the act is to "regulate
political activity" and all its provisions are germane to that
single object. The act accomplishes its one primary object by
regulating the pre-campaign political activity of candidates and
electors, by imposing limitations on the post-election political
activity of elected and appointed public officials and those who
would influence their decisions, and, through the Political
Ethics Commission, by providing a means of implementing and
enforcing such regulations. A unifying theme and concern of
the act is money for votes: the legitimate use of money to
influence the votes of the electors (in political campaigns) and
to influence the votes of elected and appointed public officials
(through lobbyists); and the corrupt use of money to buy the

REFERENCES FOR POINTS IN HEADNOTES
[1–8] 73 Am Jur 2d, Statutes § 119 *et seq.*

votes of public officials. To issue further advisory opinions on a statute which has been held unconstitutional involves the Court in the legislative process, something that the phrase "after it has been enacted into law" in the section of the Constitution on advisory opinions was intended to prevent.

Statute declared unconstitutional.

### OPINION OF THE COURT

1. STATUTES—CONSTITUTIONAL LAW—TITLE-BODY CLAUSE—ADVISORY OPINION.

An act to regulate political activity which creates a state campaign fund for gubernatorial candidates, regulates lobbying activities, requires financial disclosure by candidates and their families, provides requirements for establishment of candidate committees, and repeals acts concerning legislative agents, general election laws, conflict of interest, and ethics, embraces more than one object and is therefore in violation of the title-body clause of the state constitution (Const 1963, art 4, § 24; 1975 PA 227).

2. STATUTES—CONSTITUTIONAL LAW—TITLE-BODY CLAUSE—SEVERABILITY.

Severability is not available in cases challenging constitutionality of a statute on the ground that it embraces more than one object; the prohibition makes the whole act void (Const 1963, art 4, § 24).

3. STATUTES—CONSTITUTIONAL LAW—TITLE-BODY CLAUSE—MORE THAN ONE OBJECT.

The term "object" as used in the constitutional provision that no law shall embrace more than one object was not meant to have unlimited breadth; if the provisions of the law might have been enacted in separate laws without in any way referring to or affecting one another, then they embrace more than one object (Const 1963, art 4, § 24).

### OPINION CONCURRING IN PART AND DISSENTING IN PART

RYAN, J.

See headnotes 1-3.

4. COURTS—STATUTES—CONSTITUTIONAL LAW—ADVISORY OPINION.

*A determination in an advisory opinion by the Supreme Court that a statute is unconstitutional because it embraces more*

*than one object terminates the life of the statute and there remains no legislation on which the Court may later express an opinion of constitutionality.*

DISSENTING OPINION

KAVANAGH, C. J., and LEVIN, J.

5. STATUTES—CONSTITUTIONAL LAW—TITLE-BODY CLAUSE—ADVISORY OPINION.

*An act whose stated object is to regulate political activity and which accomplishes its one primary object by regulating the pre-campaign political activity of candidates and electors, by imposing limitations on the post-election political activity of elected and appointed public officials and those who would influence their decisions, and, through the Political Ethics Commission, by providing a means of implementing and enforcing such regulations, does not violate the title-body clause of the constitution because it has only a single object (Const 1963, art 4, § 24).*

6. STATUTES—CONSTITUTIONAL LAW—TITLE-BODY CLAUSE—"OBJECT".

*The word "object" in the title-body clause of the constitution expresses an intrinsically elastic concept; especially in the case of a codification, the Legislature is free to conceive of the object of its endeavors in terms of a common denominator and to express that conception in umbrella words (Const 1963, art 4, § 24).*

7. STATUTES—CONSTITUTIONAL LAW—TITLE-BODY CLAUSE—"OBJECT".

*The ultimate question in deciding whether an act violates the title-body clause of the constitution is not the congruity of its provisions, but whether there is one object (Const 1963, art 4, § 24).*

8. COURTS—STATUTES—CONSTITUTIONAL LAW—ADVISORY OPINION.

*Once the Supreme Court has declared an act unconstitutional, to issue further advisory opinions on the act involves the Court in the legislative process (Const 1963, art 3, § 8).*

*Frank J. Kelley,* Attorney General, and *Robert A. Derengoski,* Solicitor General.

*Charles D. Hackney, George M. Elworth, Varda N. Fink, Michael J. Hodge,* and *Norbert G. Jaworski,* Assistants Attorney General, in support of constitutionality.

*John D. Pirich,* Assistant Attorney General, in opposition to constitutionality.

*Amici Curiae:*

*Kenneth J. Guido, Jr.* and *Ellen G. Block* for Common Cause.

*Hyman & Rice* for State Bar of Michigan.

*Gary L. Cowan, Daniel F. Curran* and *Dennis R. O'Connell* for Michigan Consolidated Gas Company.

*Dykema, Gossett, Spencer, Goodnow & Trigg* (by *James D. Tracy, Nancy C. Kurtz* and *Ted T. Amsden)* for Consumers Power Company.

*Lafferty, Reosti, Papakhian & James* for Socialist Workers Party and CO DEL.

*Keywell & Rosenfeld* for Michigan Press Association.

*Honigman, Miller, Schwartz & Cohn* (by *Avern Cohn, Stanley Siegel,* and *Joseph M. Polito)* and *Downs & Edwards (McClellan, Schlaybaugh & Whitbeck,* of counsel) for Michigan Association of Broadcasters, Michigan State Grange, Michigan Library Association, Michigan Association of School Boards, Michigan Association of State College and University Governing Boards, Michigan Townships Association, Michigan State Building and Construction Trades Council, Michigan Community College Association, Michigan State Chamber of Commerce, Michigan State Farm Bureau, Michigan Association of Counties and County Road Association of Michigan.

*Cozadd, Shangle & Smith* for Michigan Association of Hospital Authorities, Inc.

PER CURIAM. On August 27, 1975, Governor William G. Milliken signed Enrolled House Bill 5250.[1] This legislation was designed "to regulate

_____

[1] MCLA 169.1–169.200; MSA 4.1701(1)–4.1701(200). For simplicity

political activity". The Act created the Political Ethics Commission as an autonomous entity within the Department of State and provided for its composition, powers and duties (§§ 31–50); provided requirements for the establishment of candidate committees (after defining "candidate" to include an elected officeholder) and provided for the filing of statements of organization and reporting of contributions and expenditures (§§ 51–98); set maximum limits on expenditures by candidates for certain offices (§§ 83–84); established a State Campaign Fund with a diversion of certain taxpayer-designated portions of income tax revenues to the fund for distribution to qualifying gubernatorial candidates (§§ 101–105); proscribed conflicts of interest (§§ 121–127); required designated individuals to file financial disclosures for themselves and members of their immediate families (§§ 131–137); required the registration and reporting of lobbying activities (§§ 141–150); and provided for the repeal of five existing laws (§ 191).

We have granted a December 9, 1975, request of the House of Representatives to review ten specific questions of law concerning the constitutionality of the Act. 395 Mich 910 (1975).

As major portions of the Act were to have gone into effect on March 31, 1976 (the effective date of some provisions of the Act was to have been delayed until July 1, 1976), and the Act was likely to have had a profound effect on the upcoming elections, we believed it imperative to review the Act before its effective date. This case was submitted to our Court on March 5, 1976, after full briefing and oral argument by the Attorney Gen-

we refer to 1975 PA 227 as the Act and any reference thereto will only recite the section numbers involved.

eral and eight amici. After careful consideration of these arguments, it is our opinion that Public Act 227 of 1975 was unconstitutionally enacted in violation of art 4, § 24 of the Constitution of 1963. We issue this opinion in order to inform the citizens of the Act's unconstitutionality prior to its early effective date. We intend, later, to issue a second opinion dealing with the nine remaining issues.

In House Resolution 248, the House of Representatives phrased its first question of law as:

"Does Act 227 of the Public Acts of 1975, being § 169.1–169.200 of the Michigan Compiled Laws embrace more than one object in violation of § 24 of art 4 of the State Constitution of 1963 which reads [in pertinent part] as follows:
" 'Section 24. No law shall embrace more than one object, which shall be expressed in its title.' "

This constitutional section embodies two separate concepts:

1. That the law shall not embrace more than one object and

2. That the object which the law embraced shall be expressed in its title. We do not direct attention here to the second concept but only to the first, whether or not more than one object is embraced in this law.

Justice Sharp in *Kent County, ex rel Board of Supervisors v Reed,* 243 Mich 120, 122; 219 NW 656 (1928), notes that:

"it is to the body of the law that we must look to determine whether it embraces more than one object".

In that case, Justice Sharp pointed out that the first section of the questioned Act imposed upon

the boards of supervisors in all counties where county officials are paid salaries fixed by such boards, the duty to fix such salaries. Section 2 of that act expressly repealed a local act of 1891 affecting the county of Kent alone. The Court said:

"Can it be said that this repeal is so connected with the object as disclosed by the provision in § 1 that it may be held to be germane to it? We think not. The provisions in these two sections might have been enacted in separate laws without either of them in any way referring to or affecting the other. The repeal of the local act was unnecessary to give legal effect to § 1. The two objects sought to be attained by the enactment have no necessary connection with each other, and, when grouped together in one act, clearly offend the constitutional provision." *Reed, supra,* 122–123.

Both of the objects of the law were covered in the title. The Court concluded by saying:

"It is clear that two distinct and unrelated objects are embraced in the one act, and that it offends against the constitutional provision." *Reed, supra,* 124.

In the briefs filed with this Court which discussed this issue, much attention was devoted to *Fritz v Gorton,* 83 Wash 2d 275; 517 P2d 911 (1974). However, in *Fritz,* the statute challenged was adopted by the initiative process by the voters of the State of Washington in the 1972 general election. Of the nine members of Washington's Supreme Court, two dissented from the holding of constitutionality and three believed that the constitutional provision there in question:

"No bill shall embrace more than one subject and that shall be expressed in the title",

did not apply to initiative but held that if it did apply, they would uphold constitutionality with the remaining four justices. Then the Washington Court held that a "rational unity" test should be applied between the general subject and the incidental subdivisions. The "rational unity" test has never been adopted in Michigan.

In the brief filed by Common Cause, a numerical count of items in the title represented 28 as having been listed claiming that they were "germane to the purpose of reforming the Michigan political process". The title of the Act does not mention reforming the political process. That brief referred to *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441; 208 NW2d 469 (1973), in which the Court held that the subject matter constituted a code, a unified law. Justice LEVIN in a concurrence mentioned the justification for its constitutionality "Especially in the case of a codification". In codes as enacted in Michigan, the Legislature tends to use in the title the words to "revise, consolidate and classify the laws" with respect to a particular object. Those words are typically found in code titles but not found here.

In the brief of the Attorney General urging a finding of unconstitutionality, a claim is made that this Act is exactly the type of legislation at which the framers of the Constitution directed their prohibition. We agree.

In addition to the multitude of varying activities sought to be regulated by this Act, the Act specifically repealed five individual and distinct acts. They concerned the licensing and regulation of legislative agents; the corrupt practice section of the general election law; two specific conflict of interest statutes; and an ethics act.

Severability is not available in instances chal-

lenging constitutionality on this ground. A prohibition against the passage of an act relating to different objects expressed in the title makes the whole act void.

"It is impossible to tell which object was intended by the Legislature, and in such case both fall under the same condemnation." *Skinner v Wilhelm,* 63 Mich 568, 572; 30 NW 311 (1886).

An early reference to the concept behind the constitutional prohibition is found in colorful language in *People v Collins,* 3 Mich 343, 384 (1854), a case in which the Court was evenly divided on the constitutionality of an act prohibiting the manufacture of intoxicating beverages and the traffic therein. The decision discussed other challenges, but in his opinion and indicative of judicial awareness of the problem, Justice PRATT said:

"This express and positive provision was incorporated into the constitution with the avowed intention on the part of the framers, of arresting, as far as possible, corruption and log rolling in legislation—you help me and I will help you—I will support your bill and help you pass it, if you will permit me to insert a section on a certain matter, etc.; a system of legislation that has often been carried so far as to become disgraceful to representatives and deeply injurious to the public." *People v Collins, supra.*

Justice COOLEY in *People, ex rel Drake v Mahaney,* 13 Mich 481 (1865), says with respect to the same provision of the Constitition of 1850:

"The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their nature, and having no

necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state." *Mahaney, supra,* 494–495.

The act which Justice COOLEY had under review was one whose general purpose was "to establish a police government for the city of Detroit". He said:

"The act, with great particularity, prescribes how this police government shall be rendered effectual; but this particularity can not possibly be objectionable *so long as it introduces nothing foreign and incongruous,* but is confined to the means supposed to be important to the end indicated." (Emphasis added.) *Mahaney, supra,* 496.

This Court cannot engage in idle speculation as to whether, for instance, the provision relating to ethical conduct and conflict of interest contracts would on their own merits have been adopted by the Legislature, nor those relating to campaign contributions and expenditures, nor those establishing the state campaign fund for gubernatorial elections, nor those regulating lobbyists. Applying the tests used by this Court in *Reed, supra,* these provisions might have been enacted in separate laws without in any way referring to or affecting one another. The term "object" as used in art 4, § 24, was not meant to have unlimited breadth, for an exceedingly broad "object" could likely include several concepts that are wholly foreign and incongruous. That result is inconsistent with the purpose of the constitutional limitation. Some of the concepts sought to be obtained by the enactment have no necessary connection with each other. Nor can it be said that these varied concepts correspond to Justice COOLEY's particularities, but in-

stead do add something foreign and incongruous. For example, the creation of a state campaign fund for gubernatorial candidates is foreign to and incongruous with regulation of lobbying activities; the financial disclosure provisions aimed at preventing unethical conduct are foreign to and incongruous with the organization of a campaign committee. The tying together of these diverse sections resulted in the Legislature being confronted by an all-or-nothing dilemma to which the framers of the Constitution directed their attention.

To say that the purification of the political process is the all-encompassing umbrella under which these various elements receive their protection is to beg the question. It is expected that much legislation within and without the scope of this Act is designed toward that worthy end.

This Court is mindful of the worthy purpose and high motivation of the Legislature and the proponents of the subject Act. It also is mindful of the basic dictates of the Constitution of this state. Our test cannot be one of policy but of constitutionality. On that test, the Act must fall.

WILLIAMS, COLEMAN, FITZGERALD, and LINDEMER, JJ., concurred.

RYAN, J. *(concurring in part and dissenting in part)*. I concur in the conclusion of the per curiam opinion that 1975 PA 227 is unconstitutional as violative of art 4, § 24 of the Constitution of 1963. I dissent from that portion of the opinion which states an intention to issue later a second opinion dealing with other raised constitutional issues, because I am persuaded that today's determination of unconstitutionality terminates the statutory life of 1975 PA 227 and thus there remains no legisla-

tion upon which this Court may later express an opinion of constitutionality under Const 1963, art 3, § 8.

LEVIN, J. *(dissenting)*. The stated object of the Act is "to regulate political activity".[1] All its provisions relate to that one object.

## I

To regulate the "political activity" of candidates, electors, appointed and elected public officials, lobbyists and others, is one object. "Legislation, if it has a primary object, is not invalid because it embraces more than 1 means of attaining its primary object."[2] The Act accomplishes its one primary object by regulating the pre-campaign political activity of candidates and electors, by imposing limitations on the post-election political

---

[1] "AN ACT to regulate political activity; to create a commission; to prescribe the powers and duties of the commission, the secretary of state, and other governmental bodies; to regulate campaign financing; to restrict campaign contributions and expenditures; to require campaign statements and reports; to prohibit anonymous contributions; to require certain anonymous funds to be transmitted to the state; to restrict use of public funds for mailings; to regulate campaign advertising and literature; to provide for segregated funds for political purposes; to create a state campaign fund; to provide for the use of public funds for political campaigns; to provide for reversion of or refunding of unexpended balances; to regulate conflict of interest, influence, and ethics of public officials, public employees, candidates, members of their immediate families, and businesses with which the individuals are associated; to regulate certain participation in making governmental decisions; to require financial statements; to regulate lobbying, lobbyists, and lobbyist agents; to require registration; to require persons to file certain statements and reports; to require persons to keep certain books and records; to permit governmental bodies to enact ordinances similar to matters covered by this act; to provide for defense funds; to provide for the collection of fees; to provide for the voiding of certain contracts; to prescribe remedies and penalties; to provide appropriations; and to repeal certain acts and parts of acts."

[2] *Local No 1644, AFSC&ME, AFL-CIO v Oakwood Hospital Corp*, 367 Mich 79, 91; 116 NW2d 314 (1962).

activity of elected and appointed public officials and those who would influence their decisions, and, through the Political Ethics Commission, by providing a means of implementing and enforcing such regulations.

Spending money in a political campaign is political activity. Limitations on contributions and expenditures and the filing of statements on the organization of candidate committees and reporting of contributions and expenditures regulate political activity.

Establishing a state campaign fund, "with a diversion of certain taxpayer-designated portions of income tax revenues to the fund for distribution to qualifying gubernatorial candidates",[3] regulates political activity in a gubernatorial campaign.

Political activity does not end when the votes are counted and oaths of office are administered. Regulating conflicts of interest and requiring financial disclosure by public officials are efforts to assure that the post-election political activity of officials and those who would influence their "vote, official action, or judgment"[4] or "decision"[5] is legitimate.

The function of the Political Ethics Commission is to implement the Act's object of regulating political activity. The Commission is to prescribe and furnish the forms to be filed pursuant to the Act, accept and examine the filings, furnish the public with summaries of non-confidential statements and reports, promulgate rules to carry out the Act, issue declaratory rulings, investigate complaints of a violation of the Act and initiate measures to enforce it.

[3] This is quoted from the opinion of the Court.
[4] MCLA 169.121; MSA 4.1701(121).
[5] MCLA 169.124; MSA 4.1701(124).

A unifying theme and concern of the Act is money for votes: the legitimate use of money to influence the votes of the electors (in political campaigns) and to influence the votes of elected and appointed public officials (through lobbyists); and the corrupt use of money to buy the votes of public officials. Restrictions on the use of money, public funding of gubernatorial campaigns, public disclosure of financial matters, with corresponding enlargement of accountability and openness, are means related to that theme and concern.

The Court concludes that the Act embraces more than one object. The Act does embrace many concepts and contains diversified provisions as does any law containing more than one idea or thought, or addressing a complex problem. Our duty, if we can fairly do so, is to coalesce these multiple concepts into one object.

"Numerous cases have held that the 'object' of a statute is the general purpose or aim of the enactment".[6] The "object may be very comprehensive and still be without objection".[7] "[It] may include all matters germane to its object" and "all those provisions which directly relate to carry out and implement the principal object".[8] "[T]his section is not to be given a narrow or strained construction".[9] "The word 'object' expresses an intrinsically elastic concept. The viewer's focus defines the object, determining in the main whether the di-

---

[6] *Local No 1644, AFSC&ME, AFL-CIO v Oakwood Hospital Corp,* supra.

[7] *The People, ex rel the Secretary of State v The State Insurance Co,* 19 Mich 392, 398 (1869).

[8] *Advisory Opinion re Constitutionality of 1972 PA 294,* 389 Mich 441, 465; 208 NW2d 469 (1973). *W A Foote Memorial Hospital, Inc v Jackson Hospital Authority,* 390 Mich 193, 210; 211 NW2d 649 (1973).

[9] *National Loan & Investment Co v Detroit,* 136 Mich 451, 452; 99 NW 380 (1904).

mensions of the object are microscopic or macro-cosmic in size".[10]

In oft-quoted language[11] this Court said:

"This provision has proved a tempting source of attack on the validity of statutes with which parties are dissatisfied, for few laws of any length are enacted where the objection cannot be plausibly urged as to details and auxiliary provisions incidental to the main purpose of the legislation appearing in the body of the act and not itemized in the title. * * * While it contains various related provisions not directly indicated or enumerated in the title, under the construction of this constitutional requirement, as many times reviewed by this court, *if the act centers to one main general object or purpose which the title comprehensively declares, though in general terms, and if provisions in the body of the act not directly mentioned in the title are germane, auxiliary, or incidental to that general purpose, the constitutional requirement is met.*" *Loomis v Rogers,* 197 Mich 265, 270, 271; 163 NW 1018 (1917). (Emphasis supplied.)

The Court relies on language in *Kent County, ex rel Board of Supervisors v Reed,* 243 Mich 120, 122; 219 NW 656 (1928): "The provisions in these two sections might have been enacted in separate laws without either of them in any way referring to or affecting the other".[12] That is not a workable

---

[10] *Advisory Opinion re Constitutionality of 1972 PA 294, supra,* pp 488–489 (1973) (LEVIN, J., concurring).

[11] *See e.g., People, for use of Regents of the University of Michigan v Brooks,* 224 Mich 45, 49; 194 NW 602 (1923); *People v Palm,* 245 Mich 396, 402; 222 NW 67 (1929); *Young v Ann Arbor,* 267 Mich 241, 244; 255 NW 579 (1934); *Michigan Boiler & Sheet Iron Works v Dressler,* 286 Mich 502, 508; 282 NW 222 (1938); *Rohan v Detroit Racing Association,* 314 Mich 326, 355; 22 NW2d 433 (1946); *Benson v State Hospital Commission,* 316 Mich 66, 78; 25 NW2d 112 (1946); *Beacon Club v Kalamazoo County Sheriff,* 332 Mich 412, 423; 52 NW2d 165 (1952); *People v Milton,* 393 Mich 234, 241; 224 NW2d 266 (1974).

[12] The statute would in effect have restored the fee system to the Register of Deeds Office of Kent County, a result inconsistent with the objective expressed in the title. *See People v Morton,* 384 Mich 38, 40;

rationale. A large number of laws would be invalid under it. In the 45 years since *Reed* was decided, this Court has not been heretofore constrained to rely on the quoted language.

In *Bissell v Heath,* 98 Mich 472, 476–477; 57 NW 585 (1894), this Court rejected a similar approach:

"It is suggested that the title expresses two objects, which might very well be the subjects of separate acts. It may be true, of any comprehensive statute, that it might be subdivided, and several laws *in pari materia* enacted in place of one; but it does not follow that an act which has but one general object is in conflict with the constitutional provision. As is stated in Cooley's Constitutional Limitations (6th ed) p 175:

" 'There has been a general disposition to construe the constitutional provision liberally, rather than to embarrass legislation by a construction whose strictness is unnecessary to the accomplishment of the beneficial purposes for which it has been adopted.' "

The legislation under consideration in *Attorney General v Weimer,* 59 Mich 580, 588; 26 NW 773 (1886), formed a county out of three townships and organized other territory into new townships. In rejecting a contention that the statute embraced more than one object, the Court said that while "there was *no necessary connection* between the formation of the county and the organization of the new townships, still *the connection is a natural one,* and the latter is clearly germane to the former". (Emphasis added.) The one-object limitation, said the Court, was not designed "to embarrass legislation by making laws unnecessarily restrictive in their scope and operation, and thus

179 NW2d 379 (1970); *Maki v East Tawas,* 385 Mich 151, 159; 188 NW2d 593 (1971).

multiplying their numbers".[13] "To require that every end and means necessary to the accomplishment of [the] general object should be provided for by a separate act relating to that alone, would not only be senseless but would actually render legislation impossible." [14]

The Court appears to recognize that codifications, such as the Michigan Penal Code,[15] the Insurance Code,[16] Probate Code,[17] Revised Judicature Act,[18] the Uniform Commercial Code[19] would

[13] The quoted words appeared first in *People, ex rel Drake v Mahaney,* 13 Mich 481, 495 (1865).

[14] *People, ex rel Drake v Mahaney, supra.*

[15] The provisions proscribing arson, burglary, robbery and homicide could all be enacted in separate laws without any of them referring to or affecting the other. The recent criminal sexual conduct act, 1974 PA 266, MCLA 750.520a, *et seq.;* MSA 28.788(1), *et seq.,* apart from repealing inconsistent and redundant legislation, stands as separate and independent legislation which does not refer to or affect the law of arson, burglary, robbery or homicide; surely, it is not invalid because it was added as an amendment to the Michigan Penal Code.

[16] This Court has advised that the no-fault motor vehicle liability act, 1972 PA 294; MCLA 500.3101 *et seq.;* MSA 24.13101 *et seq.,* did not violate the one object requirement even though it was added to the Insurance Code and it is possible to have an Insurance Code without a no-fault motor vehicle liability act and the latter could have been enacted in a separate law without either enactment referring to or affecting the other. *Advisory Opinion re Constitutionality of 1972 PA 294, supra.*

[17] The provisions concerning decedents' estates and fiduciaries have no necessary connection with juveniles. It would have been possible to deal with these two subject matters by separate laws without either of them referring to or affecting the other.

[18] The statutory provisions abolishing the defense of governmental function resulting from the negligent operation of a motor vehicle (MCLA 600.2904; MSA 27A.2904) and limiting the liability of a merchant for conduct involving persons suspected of larceny of goods (MCLA 600.2917; MSA 27A.2917) could have been enacted as separate laws and have no necessary connection to an act dealing largely with the organization and function of civil courts. *See People v Milton,* 393 Mich 234; 224 NW2d 266 (1974).

[19] "The UCC replaced separate laws on sales, stock transfer negotiable instruments, bulk sales, warehouse receipts, bills of lading, bank checks, motor vehicle installment sales contracts, trust receipts, fraudulent conveyances, discharge of chattel mortgages, foreclosures of chattel mortgages, liens on inventory and many more. When first enacted, each of these separate laws stated its own separate object."

be invalid if they were scrutinized under the Court's "foreign and incongruous"/"no necessary connection"/"might have been enacted in separate laws" rationale.

A codification "necessarily embodie[s] various and somewhat diversified provisions".[20] "Codification of multifarious enactments would be impossible if the constitution obliges the Legislature to define the object of a codification in narrow terms. Especially in the case of a codification, the Legislature is free to conceive of the object of its endeavors in terms of a common denominator and to express that conception in umbrella words." [21]

Codifications are not exceptions to the constitutional requirement that an act embrace only one object. The object of a codification, however, like a mosaic, is many-faceted.

The Court says that it does "not direct attention here to the second concept" ("[t]hat the object which the law embraced shall be expressed in its title"), but it nevertheless seeks to distinguish the codification cases from this case because the title of this Act does not contain the phrase "revise, consolidate and classify the laws", generally found in most codifications. If that is a prerequisite, the Uniform Commercial Code would also fall because neither those words nor a facsimile appear in its title.[22]

---

*Advisory Opinion re Constitutionality of 1972 PA 294, supra,* pp 488–489 (1973) (Levin, J., concurring). The separate chapters of the UCC might have been enacted in separate laws without referring to or affecting the others. They have "no necessary connection" with each other.

[20] *Regents of University of Michigan v Pray,* 264 Mich 693, 697; 251 NW 348 (1933).

[21] *Advisory Opinion re Constitutionality of 1972 PA 294, supra,* pp 488–489 (1973) (Levin, J., concurring).

[22] True, the UCC is dubbed a "code" in the body of the act, and this act is not. We may properly look to the body of the law to determine its object—that is indeed where we should look. *See In re Brewster*

This Act is a revision and a codification, albeit also—like most revisions and codifications—an extension of existing law. As stated by the Court, this Act specifically repeals "five individual and distinct acts. They concerned the licensing and regulation of legislative agents; the corrupt practice section of the general election law; two specific conflict of interest statutes; and an ethics act".[23] The object "to revise, classify and consolidate" the laws "regulat[ing] political activity" appears both from the title[24] and from the body of the Act even though the words "revise, classify and consolidate" do not appear in the title. "Only the general object and not all the details and incidents of a statute need be indicated in the title".[25] "Any provisions germane to the subject expressed in the title may properly be included in the act." [26]

---

*Street Housing Site,* 291 Mich 313, 341; 289 NW 493 (1939); *Attorney General v Union Guardian Trust Co,* 273 Mich 554, 558; 263 NW 866 (1935); *Kent County, ex rel Board of Supervisors of Kent County v Reed,* 243 Mich 120, 122; 219 NW 656 (1928); *Loomis v Rogers,* 197 Mich 265, 271; 163 NW 1018 (1917). Whether an act in fact embraces only one or more than one object can only be determined upon examination of the act itself, not by reading its title. Upon examination of this Act it is apparent that it is a codification of the laws concerning campaign expenditures, lobbyists, conflicts of interest, standards of conduct for public officials.

[23] The acts repealed are:

(a) 1947 PA 214, licensing and regulation of the activities of "legislative agents" (lobbyists). MCLA 4.401–4.410; MSA 2.601–2.610.

(b) 1954 PA 116, Ch XXXIV, captioned Campaign Expenses, of the Michigan Election Law, MCLA 168.901–168.929; MSA 6.1901–6.1929.

(c) 1968 PA 317, regulating the conduct of public officials in respect to contracts with public entities. MCLA 15.321–15.330; MSA 4.1700(51)–4.1700(60).

(d) 1968 PA 318, conflicts of interests of members of the Legislature and state officials in respect to contracts. MCLA 15.301–15.310; MSA 4.1700(21)–4.1700(30).

(e) 1973 PA 196, standards of conduct for public officers and employees; creating a state board of ethics. MCLA 15.341–15.348; MSA 4.1700(71)–4.1700(78).

[24] "An Act to regulate political activity * * * and to repeal certain acts and parts of acts." *See* footnote 1.

[25] *People v Sowall,* 279 Mich 261, 266; 271 NW 751 (1937).

[26] *Westgate v Adrian Township,* 161 Mich 333, 335; 126 NW 422

The Court finds it "foreign" and "incongruous" to tie together "the creation of a state campaign fund for gubernatorial candidates * * * with regulation of lobbying activities", and "financial disclosure provisions aimed at preventing unethical conduct * * * with the organization of a campaign committee".[27] Surely this is no more "foreign" or "incongruous" than tying together the law of sales or of negotiable instruments with secured transactions (Uniform Commercial Code), no-fault automobile liability with fire insurance (Insurance Code), neglected and delinquent children with decedents' estates (Probate Code), governmental tort immunity with the organization of a district court (Revised Judicature Act).

A law does not introduce "foreign and incongruous" matter if, said the Court in phrasing that *obiter dictum,* it "is confined to the means *supposed* to be important to the end indicated".[28] (Emphasis supplied.) This Legislature supposes that the regulation of campaign expenditures, state financing of gubernatorial campaigns, lobbying and financial disclosures are means "important to the end indicated" of "regulat[ing] political activity". This Court does not say otherwise but substitutes its own supposition of the appropriate format of legislation.

---

(1910); *Benson v State Hospital Commission,* 316 Mich 66, 77; 25 NW2d 112 (1946).

[27] The preceding quotations in this paragraph are from the opinion of the Court.

[28] "The act, with great particularity, prescribes how this police government shall be rendered effectual; but this particularity can not possibly be objectionable so long as it introduces nothing foreign and incongruous, but is confined to the means supposed to be important to the end indicated." *People, ex rel Drake v Mahaney, supra,* p 496.

The phrase "no necessary connection", also from *People, ex rel Drake v Mahaney, supra,* p 495, is also *obiter dictum.*

It appears from his writings that Justice Cooley was especially concerned with combinations of special interest groups to enact selective legislation benefiting their private interests.

In *People v Milton,* 393 Mich 234, 241, 248; 224 NW2d 266 (1974) this Court said:

"Not infrequently there will be a number of existing acts to which the new legislation would be germane, auxiliary or incidental. The legislative choice will not be held invalid merely because an alternative location for the new legislation might appear to some more appropriate."

We rejected a claim that an amendment to the Revised Judicature Act creating the district court was defective insofar as it purports to vest criminal jurisdiction in that court: "the correct question is not whether the Legislature *might* have included provisions concerning the criminal jurisdiction of the district court in the Code of Criminal Procedure, but rather whether provisions establishing criminal jurisdiction are germane to the general purpose of the RJA". (Emphasis supplied.)

The ultimate question here is not congruity, but whether there is one object. Asking the wrong question, the Court ordains a wrong conclusion.

There are five chapters in the Act. The Court does not advise the Legislature what division of the Act would be congruous. Are there one or more chapters that are congruous with each other? Are there any incongruities within any chapter? Nor does the Court indicate whether the defect it perceives can be remedied by adding to the title: "to revise, classify and consolidate". If not, why not? How does this codification otherwise differ from other codifications?

The Court's advisory opinion poses more questions than it answers, puts in question the validity of many statutes the constitutionality of which heretofore was undoubted and will encourage costly and time-consuming litigation. By changing

the emphasis from object to congruity/necessary connection/might have been enacted in separate laws, the Court assures itself of much grist for the mill.

## II

The Court commits itself to issue further opinions despite its declaration of unconstitutionality.

The Constitution permits an advisory opinion "on important questions of law upon solemn occasions as to the constitutionality of legislation *after it has been enacted into law* but before its effective date". Const 1963, art 3, § 8. (Emphasis supplied.)

Delegate (now Secretary of State) Austin in proposing on the floor the amendment adding "after it has been enacted into law" stated that the purpose was to "prevent the supreme court from getting involved until the legislative process was completed and they would be working with a law rather than some bills or proposals for legislation".[29]

The apparent purpose of issuing further opinions is to assist the Legislature in its further efforts. The Court cannot do so without "getting involved" in the legislative process.

KAVANAGH, C. J., concurred with LEVIN, J.

[29] 1 Official Record Constitutional Convention 1961, p 1548.