MICHIGAN STATE CHAMBER OF
COMMERCE, A non-profit
Michigan corporation, Plaintiff,

v.

Richard H. AUSTIN, Michigan Secretary
of State, and Frank J. Kelley, Michigan
Attorney General, Defendants.

No. G85–496CA5.

United States District Court,
W.D. Michigan, S.D.

Sept. 3, 1986.

Richard D. McLellan, William J. Perrone, Lansing, Mich., Joel M. Boyden, Grand Rapids, Mich., for plaintiff.

Frank J. Kelley, Atty. Gen., Richard P. Gartner, Asst. Atty. Gen., Lansing, Mich., for defendants.

Michael Corcoran, Lansing, Mich., for Mich. Citizens Lobby.

Theodore Sachs and Mark Brewer, Detroit, Mich., for Michigan Democratic Party.

## OPINION

HILLMAN, Chief Judge.

This lawsuit concerns the constitutionality of section 54(1) of the Michigan Campaign Finance Act, M.C.L. § 169.254(1), under the First and Fourteenth Amendments to the United States Constitution and Article I of the Michigan Constitution. Plaintiff is the Michigan State Chamber of Commerce. Defendants are Richard H. Austin, the Michigan Secretary of State, and Frank J. Kelley, the Michigan Attorney General.

On May 24, 1985, plaintiff filed this action for declaratory and injunctive relief against the enforcement of section 54(1) of the Michigan Campaign Finance Act (the "Act"). Section 54(1) prohibits corporations from making an expenditure in support of or in opposition to the nomination or election of a political candidate. A corporation which violates section 54(1) is guilty of a felony and subject to a fine of $10,000. M.C.L. § 169.254(5). In brief, plaintiff alleges that section 54(1) violates the First Amendment, the equal protection clause of the Fourteenth Amendment, and similar provisions of the Michigan Constitution.

On May 9 and 12, and June 12, 13, 1986, the parties tried this lawsuit to this court without a jury. The following opinion constitutes this court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

## FACTUAL and PROCEDURAL BACKGROUND

Plaintiff is a non-profit, Michigan corporation established in 1959 and consisting of approximately 8,000 members. Of those 8,000 members, more than 75 percent are corporations. Plaintiff seeks to promote the economic interests of its members and Michigan businesses generally through a number of activities. For example, plaintiff furthers the business training and education of its members by sending its members newsletters, bulletins, and reports and by organizing seminars and conventions. Plaintiff also seeks to encourage and maintain ethical business practices. Finally, plaintiff assumes an active role in political affairs as part of its work for its members and Michigan businesses. Plaintiff participates in the political process by lobbying the Michigan legislature with respect to particular legislation or regulations, advocating the passage or defeat of ballot questions, and communicating with its members about partisan political issues. In addition, plaintiff established in 1977 a separate segregated fund—the Michigan State Chamber of Commerce Political Action Committee ("Chamber PAC")—that, among other things, directly participates in political elections. Plaintiff's role in the Michigan electoral process is the subject of this litigation.

A special election was called for Monday, June 10, 1985, to fill a vacancy in the 93rd legislative district for the Michigan House of Representatives. Through a paid advertisement in the June 9, 1985 edition of the Grand Rapids Press [1] plaintiff wished to make a public statement in support of Richard Bandstra, a candidate in the special election. Plaintiff's intended statement was not at the direction or under the control of Mr. Bandstra or any committee advocating his election. Fearing criminal prosecution under M.C.L. § 169.254(5), plaintiff filed this action for declaratory and permanent injunctive relief allowing it

---

1. The Grand Rapids Press is a daily newspaper with a circulation of approximately 140,000. The Grand Rapids Press is the only major daily newspaper in the Grand Rapids metropolitan area.

to support, apart from the Chamber PAC, the nomination and election of political candidates such as Richard Bandstra through political advertisements and other independent expenditures.[2]

During the trial of this matter on May 9 and 12, and June 12 and 13, 1986, the court heard the testimony of seven witnesses and received 53 exhibits into evidence.[3] All seven witnesses provided a much needed background or context to the constitutional questions presented in this lawsuit. The testimony of H. Richard Mayberry, Jr., on behalf of plaintiff, and Edwin M. Epstein, on behalf of defendants, proved especially helpful to the court. Those gentlemen each testified with much candor and expertise concerning the realities of campaign financing specifically and political elections generally. Although I must often agree with Carl Sandburg's observation that "[a]n expert is only a damned fool a long ways from home", in this case the expertise of Mr. Mayberry and Mr. Epstein aided the court's understanding of the political realities and competing interests underlying the constitutional issues raised by governmental regulation of political campaigns. Their testimony, along with the testimony of the other witnesses, informed and shaped the following discussion. *See Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 1469, 84 L.Ed.2d 455 (1985).

The issues raised by this case have been extensively and amply briefed by the parties. In addition, the court permitted the

Michigan Democratic Party to file an *amicus curiae* brief at the summary judgment hearing. The Michigan Democratic Party subsequently sought leave to file a post-trial memorandum. I permitted the filing of this memoranda under the erroneous impression plaintiff had no objection. Plaintiff timely objected and I regret the misunderstanding. However, the *amicus* brief, in no way, affected the outcome of the case.

## DISCUSSION

A. *Section 54(1) of the Michigan Campaign Finance Act.*

Section 54(1) of the Michigan Campaign Finance Act is the product of a long standing effort by the Michigan legislature to regulate abuses of the electoral process. Along with several other states and the federal government, the State of Michigan enacted legislation during the Progressive Era prohibiting corporate contributions and, expenditures in connection with political elections. *See generally* 1913 P.A. 109, § 14; *People v. Gansley,* 191 Mich. 357, 158 N.W. 195 (1916). *See also United States v. Auto. Workers,* 352 U.S. 567, 570–76, 77 S.Ct. 529, 530–33, 1 L.Ed.2d 563 (1957). In the wake of the scandals surrounding the 1972 Presidential election, the Michigan legislature amended the Corrupt Practices Act of 1913 in 1975 and again in 1976.[4] *See* 1975 P.A. 227; 1976 P.A. 388. The 1976 Act greatly expanded the role of corporations in Michigan political elections by allowing corporations to establish and fund the administration of separate segre-

---

**2.** Although this court denied plaintiff's motion for a temporary injunction with respect to the June, 1985 special election, this "case falls within the class of controversies 'capable of repetition, yet evading review.'" *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 774, 98 S.Ct. 1407, 1414, 55 L.Ed.2d 707 (1978) (quoting *Southern Pacific Terminal Co. v. ICC,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911)). Consequently, I find that this case is not moot and proceed to consider the merits of plaintiff's claims.

**3.** At trial, the parties offered six additional exhibits: plaintiff's exhibits 15 and 16, and defendants' exhibits 7a, 7b, 7c, and 7d. The court

withheld a ruling upon the admissibility of those exhibits. After considering the parties' arguments in favor and opposition to the introduction of those exhibits, I find that plaintiff's exhibits 15 and 16, and defendants' exhibits 7a and 7d are admissible into evidence.

**4.** In 1976, the Michigan legislature re-enacted the 1975 Act in response to two advisory opinions by the Michigan Supreme Court finding the 1975 Act unconstitutional under the federal and state constitutions. *See Advisory Opinion on Constitutionality of 1975 P.A. 227,* 396 Mich. 123, 240 N.W.2d 193; 396 Mich. 465, 242 N.W.2d 3 (197).

gated funds, which could make expenditures in support of political candidates. *See* M.C.L. § 169.255(1). In section 54(1) of the 1976 Act, however, the Michigan legislature continued the prohibition of corporate expenditures in political elections found in the 1913 Corrupt Practices Act.

Section 54(1) of the Michigan Campaign Finance Act provides that:

"Except with respect to the exceptions and conditions in subsections (2) and (3) and section 55, and to loans made in the ordinary course of business, a corporation may not make a contribution or expenditure or provide volunteer personal services which services are excluded from the definition of a contribution pursuant to section 4(3)(a)."

M.C.L. § 169.254(1). The Act defines an "expenditure" to include "a payment, donation, loan, pledge, or promise of payment of money or anything of ascertainable monetary value for goods, materials, services, or facilities in assistance of or in opposition to, the nomination or election of a candidate, or the qualification, passage, or defeat of a ballot question." M.C.L. § 169.206(1). Within the larger class of expenditures, the Act defines an "independent expenditure" as "an expenditure ... by a person if the expenditure is not made at the direction of, or under the control of, another person and if the expenditure is not a contribution to a committee." M.C.L. § 169.209(1).

In this case, plaintiff's proposed advertisement in favor of candidate Bandstra involved an independent expenditure within the meaning of the Act. Plaintiff intended to make a payment of money for goods or services in assistance of the election of a candidate. That payment was not to be made at the direction or under the control of candidate Bandstra or his campaign committee. Accordingly, plaintiff's proposed payment for the newspaper advertisement in favor of candidate Bandstra would have constituted an independent ex-

penditure under the Act. *See* M.C.L. §§ 169.206(1), 169.209(1).

Before considering plaintiff's constitutional challenges to section 54(1), I must first determine whether section 54(1) prohibits corporate independent expenditures such as plaintiff's proposed independent expenditure in support of candidate Bandstra. *See United States v. C.I.O.*, 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). Section 54(1), by its terms, fails to prohibit "independent expenditures" by corporations. Instead, section 54(1) prohibits the larger class of "expenditures" by corporations without an explicit prohibition of the narrower class of independent expenditures. Nonetheless, because all "independent expenditures" are "expenditures" within the meaning of the Act, the prohibition of "expenditures" in section 54(1) by definition includes a prohibition of "independent expenditures." For example, if the numbers 1 and 2 comprise sub-set A and the number 1, 2, 3, and 4 comprise set B, then an exclusion of set B without mention of sub-set A would require exclusion of sub-set A as well. Consequently, this court cannot avoid ruling upon plaintiff's constitutional challenges to section 54(1) based upon the argument that section 54(1) fails to prohibit corporate independent expenditures such as the advertisement proposed by plaintiff in favor of Richard Bandstra.

B. *The Constitutionality of Section 54(1).*

Plaintiff challenges the constitutionality of the prohibition of corporate independent expenditures in political elections by section 54(1) under the United States and Michigan Constitutions. Specifically, plaintiff contends that section 54(1) violates its freedom of speech as guaranteed by the First Amendment to the Constitution[5] and Article I, §§ 3, 5 of the Michigan Constitution. Second, plaintiff alleges that section 54(1)'s prohibition of corporate independent

---

**5.** First Amendment liberties are made applicable to the states through the due process clause of the Fourteenth Amendment. *E.g., Virginia State Bad. of Pharmacy v. Virginia Citizens Con-* *sumer Council, Inc.,* 425 U.S. 748, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976). Nonetheless, for the sake of clarity and consistency, I shall refer only to the First Amendment.

expenditures violates the equal protection clause of the Fourteenth Amendment and Article I, § 2 of the Michigan Constitution by distinguishing between corporate and other non-corporate business entities. Finally, plaintiff complains that the Act violates the equal protection clause of the Fourteenth Amendment and Article I, § 2 of the Michigan Constitution by exempting certain newspaper articles from the reach of section 54(1). *See* M.C.L. § 169.-206(3)(d).

Throughout the pretrial and trial proceedings of this matter plaintiff failed to distinguish between its claims under the United States Constitution and its claims under the Michigan Constitution. However, with regard to the context of legislative restraints upon electoral activities, the Michigan Supreme Court interprets Article I, §§ 2, 3, and 5 of the Michigan Constitution identically with similar protections in the First and Fourteenth Amendments to the Constitution. *See Advisory Opinion 1975 Constitutionality of 1975 P.A. 227,* 396 Mich. 465, 484–85, 492–93, 242 N.W.2d 3, 9–10, 14 (1976). Accordingly, the following analysis under the First and Fourteenth Amendments to the Constitution shall apply equally to plaintiff's claims under the Michigan Constitution.

(1) *The First Amendment and Corporate Independent Expenditures in Political Elections* —The First Amendment to the Constitution forbids states from enacting any law abridging the freedom of speech. *E.g., Joseph Burstyn, Inc. v. Wilson,* 343 U.S. 495, 500–501, 72 S.Ct. 777, 779–780, 96 L.Ed. 1098 (1952). Section 54(1)'s prohibition of corporate independent expenditures in political elections strikes at speech within the traditional core of the First Amendment. As the Court explained in *Buckley v. Valeo,* 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976),

"debate on the qualifications of candidates [is] integral to the operation of the system of government established by our Constitution. The First Amendment affords the broadest protection to such political expression in order 'to assure the

unfettered interchange of idea for the bringing about of political and social changes desired by the people' *Roth v. United States,* 354 U.S. 476, 484 [77 S.Ct. 1304, 1308, 1 L.Ed.2d 1498] (1957).... In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation. As the Court observed in *Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 [91 S.Ct. 621, 625, 28 L.Ed.2d 35] (1971), 'it can hardly be doubted' that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.' "

In addition, speech such as a corporate independent expenditure in a political election "does not lose its First Amendment protection because money is spent to project it." *Virginia State Bd. of Pharmacy v. Virginia Citizens Consumer Council, Inc.,* 425 U.S. 748, 761, 96 S.Ct. 1817, 1825, 48 L.Ed.2d 346 (1976). Section 54(1) limits corporations' means to participate in the electoral process. Section 54(1), therefore, imposes a limitation upon plaintiff's freedom of speech by prohibiting corporate independent expenditures in political elections. Section 54(1), however, is not unconstitutional simply because it places a restraint upon protected speech. Instead, this court must determine whether defendants can offer sufficient justification for the limitation upon plaintiff's freedom of speech. Specifically, I must consider whether the prohibition of corporate independent expenditures in political elections found in section 54(1) is (i) a reasonable time, place, or manner restriction, or (ii) a narrowly tailored means of serving a compelling state interest. *See Consolidated Edison Co. v. Public Service Commission,* 447 U.S. 530, 535, 100 S.Ct. 2326, 2332, 65 L.Ed.2d 319 (1980).

Reasonable time, place or manner regulations that fulfill a significant governmental interest and leave ample alternative channels for communication are permissi-

ble under the First Amendment. *Id.* A governmental regulation upon speech cannot be justified as a time, place, or manner restriction if based upon either the content or subject matter of the speech. "[T]ime, place, and manner regulations must be 'applicable to all speech irrespective of content.'" *Id.* at 536, 100 S.Ct. at 2332 (quoting *Erznoznik v. City of Jacksonville,* 422 U.S. 205, 209, 95 S.Ct. 2268, 2272, 45 L.Ed.2d 125 (1975)). Although some regulations defy easy classification as a content/subject matter regulation or a time, place, manner regulation,[6] section 54(1) clearly imposes a content/subject matter regulation upon corporations' speech. Section 54(1) prohibits particular speech precisely because of the content of that speech—speech "in assistance of, or in opposition to, the nomination or election of a candidate." M.C.L. § 169.206(1). Consequently, section 54(1)'s prohibition of corporate independent expenditures in political elections cannot be upheld as a content-neutral time, place, or manner regulation. *See Federal Election Commission v. Massachusetts Citizens for Life, Inc.,* 769 F.2d 13, 22 (1st Cir.1985).

Defendants may prohibit corporate independent expenditures in political elections if that prohibition is a precisely drawn means of serving a compelling state interest. *See Consolidated Edison Co.,* 447 U.S. at 540, 100 S.Ct. at 2334. In this case, defendants offer several justifications in support of the prohibition upon corporate independent expenditures contained in section 54(1). First, defendants maintain that section 54(1) protects the integrity of the electoral process by preventing corruption and the appearance of corruption created by large, corporate independent expenditures on behalf of political candidates. Second, defendants argue that section 54(1)

protects the interests of some shareholders by preventing the use of corporate funds to elect political candidates whom those shareholders may oppose. Third, defendants contend that section 54(1) ensures that the electorate is fully informed of the sources of campaign finances by requiring corporations to make their campaign expenditures from a separate segregated fund which must report the names of its contributors. For the following reasons, I find that section 54(1)'s prohibition of corporate independent expenditures in political elections serves the state's compelling interest in preventing corruption or the appearance of corruption in the electoral process.[7]

No doubt exists that a state's interest in safeguarding the electoral process from corruption or the appearance of corruption is a compelling interest. As the Supreme Court explained in *First National Bank of Boston v. Bellotti,* 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978):

"Preserving the integrity of the electoral process, preventing corruption, and 'sustaining the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government' are interests of the highest importance. Preservation of the individual citizen's confidence in government is equally important."

*Id.* at 788–89, 98 S.Ct. at 1422 (quoting *United States v. Automobile Workers,* 352 U.S. at 575, 77 S.Ct. at 533). This case, however, presents the question whether a prohibition of corporate independent expenditures in political campaigns serves the governmental interest in stemming the reality or appearance of corruption in the electoral process.

If section 54(1) prohibited individuals from making independent expenditures in political campaigns, then section 54(1)

---

6. *Compare City of Renton v. Playtime Theatres, Inc.,* —— U.S. ——, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986) *with Id.,* —— U.S. at ——, 106 S.Ct. at 933–37 (Brennan, J., dissenting).

7. Given this holding, no reason exists to consider the merits of defendants' second and third justifications for section 54(1). Nonetheless, I note that the Supreme Court has held that "pre-

venting corruption or the appearance of corruption are the only legitimate and compelling interest thus far identified for restricting campaign finances." *Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 1469, 84 L.Ed.2d 455 (1985).

would necessarily fall as unconstitutional under the First Amendment. *Buckley v. Valeo,* 424 U.S. 1, 39–51, 96 S.Ct. 612, 644–650, 46 L.Ed.2d 659 (1976)–(per curiam). In *Buckley,* the Court "struck down the [Federal ELection Campaign Act's] limitation on individuals' independent expenditures because [it] found no tendency in such expenditures, uncoordinated with the candidate or his campaign, to corrupt or to give the appearance of corruption." *Federal Election Commission v. National Conservative Political Action Committee,* 470 U.S. 480, 105 S.Ct. 1459, 1469, 84 L.Ed.2d 455 (1985)—(finding the Presidential Election Campaign Fund Act's limitation on independent expenditures by political committees to be unconstitutional under the First Amendment). The *Buckley* Court explained that generally independent expenditures by individuals unlike direct contributions to political candidates, do not pose the dangers of actual or apparent *quid pro quo* arrangements between a candidate and her supporters. "The absence of prearrangement and coordination of an expenditure with the candidate or his agent ... alleviates the danger that expenditures will be given as a *quid pro quo* for improper commitments from the candidate." *Buckley,* 424 U.S. at 47, 96 S.Ct. at 648. The Court on several occasions, however, has expressly left unanswered whether a state or the federal government may prohibit corporations from making independent expenditures to influence elections for public office. *See National Conservative Political Action Committee,* 105 S.Ct. at 1468; *Bellotti,* 435 U.S. at 788 n. 26, 98 S.Ct. at 1422 n. 26. This case presents that exact issue.

▮ Corporations generally share First Amendment liberties commensurate with individuals. *See Bellotti,* 435 U.S. at 777–86, 98 S.Ct. at 1416–1421. Nonetheless, under some circumstances courts may find an unconstitutional limitation upon individuals' speech to be permissible limitation upon corporations' speech. *See Pacific Gas & Electric v. P.U.C. of Cali-*

*fornia,* —— U.S. ——, 106 S.Ct. 903, 917, 89 L.Ed.2d 1 (1986) (Marshall, J., concurring); *California Medical Association v. Federal Election Commission,* 453 U.S. 182, 201, 101 S.Ct. 2712, 2724, 69 L.Ed.2d 567 (1981). In the context of independent expenditures to influence political elections such as a distinction between individuals and corporations is warranted.

▮ "Favors from government often carry with them an enhanced measure of regulation." *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 368, 94 L.Ed. 401 (1950). The Michigan legislature has granted corporations the advantages of perpetual life, limited liability, and wide-ranging powers to encourage economic expansion and prosperity. *See generally* M.C.L. § 450.1101 *et seq.* Such advantages allow corporations to amass great aggregations of capital and influence. In the economic sphere such power is proper and often highly beneficial to the general welfare of our society. In the political sphere, however, such power coupled with the faceless nature of corporations may very well create an atmosphere of distrust or the appearance of corruption in the electoral process. Unlike in referenda on issues of general public interest, this atmosphere of distrust in the electorate may arise in political elections where corporate power through either independent expenditures or direct contributions becomes closely allied with candidates. The Michigan legislature, as well as the United States Congress,[8] long ago arrived at that conclusion and, accordingly, limited the role of corporations in the electoral process. *See Advisory Opinion on Constitutionality of 1975 P.A. 227,* 396 Mich. 465, 242 N.W.2d 3 (1976); *Gansley,* 191 Mich. 357, 158 N.W. 195 (1916). "The differing restrictions placed on individuals and unincorporated associations, on the one hand, and on ... corporations, on the other, reflect a judgment by [the legislature] that these entities have differing structures and purposes, and that they therefore may require different forms of regulation in order to protect

---

**8.** *See United States v. C.I.O.,* 335 U.S. 106, 68   S.Ct. 1349, 92 L.Ed. 1849 (1948).

the integrity of the electoral process." *California Medical Association*, 453 U.S. at 201, 101 S.Ct. 2724. The judgment of the Michigan legislature, as expressed in sections 54(1) and 55 of the Michigan Campaign Finance Act, "to account for the particular legal and economic attributes of corporations ... warrants considerable deference." *Federal Election Commission v. National Right to Work Committee*, 459 U.S. 197, 209, 103 S.Ct. 552, 560, 74 L.Ed.2d 364 (1982). Courts should not "second-guess a legislative determination as to the need for prophylactic measures where corruption is the evil feared." *Id.* at 210, 103 S.Ct. at 561. Section 54(1) is such a prophylactic measure narrowly tailored to the state's interest in preventing the appearance of corruption in elections for public office.

Although section 54(1) of the Act prohibits corporations such as plaintiff from independently expending money to influence elections for public office, section 55(1) of the Act allows corporations to "make an expenditure for the establishment and administration and solicitation of contributions to a separate segregated fund to be used for political purposes." M.C.L. § 169.255(1). A separate segregated fund, such as the Chamber PAC, can fully participate in electoral politics. For example, the record in this case amply demonstrates that the Chamber PAC frequently makes independent expenditures to influence political elections, and those efforts have been tremendously successful in electing Chamber PAC endorsed candidates. A separate segregated fund, however, is without the unlimited economic advantages and power of corporations with vast resources. Through its allowance for separate segregated funds, the Michigan Campaign Finance Act provides an opportunity for corporate input into electoral politics while guarding against actual or perceived alliances between corporate power and political candidates. It does not matter, of course, that there has not been a finding of actual corruption, given that corporate independent expenditures for candidates have been banned since 1913. Clearly, however, a finding of the threat or appearance of corruption is enough. Read in conjunction with section 55(1), therefore, section 54(1) is a narrowly tailored prohibition of corporate independent expenditures in political elections.

In conclusion, although directly infringing plaintiff's freedom of speech protected by the First Amendment, section 54(1)'s prohibition of corporate independent expenditures in political elections is a narrowly drawn regulation that serves a compelling state interest. Consequently, section 54(1) is valid under the First Amendment to the Constitution. Plaintiff's complaint of financial restrictions and limitations placed upon it by this legislation should more properly be addressed to the state legislature.

(2) *The Equal Protection Clause and Corporate Independent Expenditures in Political Elections*—In addition to its claim under the First Amendment, plaintiff claims that section 54(1) Campaign Finance Act violates the equal protection clause of the Fourteenth Amendment. Plaintiff presents two specific claims under the equal protection clause. First, plaintiff contends that section 54(1) of the Act impermissibly distinguishes between corporations, on one hand, and noncorporate business entities and labor unions, on the other hand, in prohibiting independent expenditures in political elections. Second, plaintiff argues that the Act impermissibly discriminates against plaintiff and other non-media corporations by exempting media corporations from the prohibition of section 54(1). *See* M.C.L. § 169.206(3)(d).

■ Corporations are entitled to the equal protection of the laws as guaranteed by the Fourteenth Amendment. *E.g., Gulf, Colorado & Santa Fe Railway Co. v. Ellis*, 165 U.S. 150, 17 S.Ct. 255, 41 L.Ed. 666 (1897). The equal protection clause of the Fourteenth Amendment " 'does not require things which are different in fact or opinion to be treated in law as though they were the same.' " *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d

786 (1982) (quoting *Tigner v. Texas,* 310 U.S. 141, 147, 60 S.Ct. 879, 882, 84 L.Ed. 1124 (1940)). Instead, the equal protection clause forbids "invidious" distinctions between persons by the states. *Williams v. Rhodes,* 393 U.S. 23, 30, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). Federal courts consider legislative distinctions presumptively invidious when those distinctions burden the exercise of a fundamental right under the Constitution. *Plyler,* 457 U.S. at 216–17, 102 S.Ct. at 2394–95. In order to survive scrutiny under the Fourteenth Amendment, such distinctions must be precisely tailored to serve a compelling state interest. *Id.* at 217, 102 S.Ct. at 2395. In this case, section 54(1) of the Act burdens plaintiff's exercise of its First Amendment right to freedom of speech,[9] which is a fundamental right under the Constitution. Therefore, any distinctions in section 54(1) between plaintiff and other persons must be precisely tailored to serve a compelling state interest. For the following reasons, I find that section 54(1) satisfies such strict scrutiny.

Section 54(1) distinguishes between corporations and non-corporate persons or entities. Section 54(1) does not distinguish between corporations and labor unions. As the record establishes in this case, a number of labor unions are incorporated in the State of Michigan. Section 54(1) prohibits independent expenditures in political elections by those labor unions as well as any other corporations. Although section 54(1) does distinguish between corporations and non-corporate business entities such as partnerships, that distinction serves a compelling state interest. As previously explained in this opinion, section 54(1)'s burden upon plaintiff's freedom of speech serves a compelling state interest because of the unique threat of corporate power to the electoral process. *See California Medical Association,* 453 U.S. at 201, 101 S.Ct. at 2724. Therefore, plaintiff's first claim under the equal protection clause of the Fourteenth Amendment must fail.

As its second claim under the equal protection clause, plaintiff maintains that section 54(1) impermissibly distinguishes between media and non-media corporations. Section 6(3)(d) of the Act, M.C.L. § 169.-206(3)(d), establishes that an expenditure under section 54(1) does not include:

"An expenditure by a broadcasting station, newspaper, magazine, or other periodical or publication for any news story, commentary, or editorial in support of or opposition to a candidate for elective office, or a ballot question in the regular course of publication or broadcasting."

Section 6(3)(d) makes no distinction between media and non-media corporations. Any corporation, whether termed a "media" corporation or a "non-media" corporation,[10] may avail itself of the exemption from section 54(1) provided by section 6(3)(d). *Cf. United States v. C.I.O.,* 335 U.S. 106, 68 S.Ct. 1349, 92 L.Ed. 1849 (1948). Therefore, plaintiff's second claim under the equal protection clause must fail.

### SUMMARY

In summary, the prohibition of corporate independent expenditures in political elections by section 54(1) of the Michigan Campaign Finance Act burdens plaintiff's freedom of speech as protected by the First Amendment. Nonetheless, section 54(1)'s prohibition of corporate independent expenditures in political elections is a narrowly drawn regulation that serves a compelling state interest. Consequently, section 54(1) is valid under the First Amendment to the Constitution and Article I, §§ 3 and 5 of the Michigan Constitution.

With respect to plaintiff's claims under the equal protection clause of the Fourteenth Amendment, any distinctions between corporations and non-corporate entities have been narrowly tailored to serve a compelling state interest. Further, in its prohibition of corporate independent expenditures to influence elections for public

---

**9.** *See supra* at 400.

**10.** I have grave doubts whether such a distinction could, in reality, be made. *See Bellotti,* 435

U.S. at 796, 98 S.Ct. at 1426 (Burger, C.J., concurring).

office, section 54(1) of the Act makes no distinction between "media" corporations and "non-media" corporations. Consequently, section 54(1) is valid under the equal protection clause of the Fourteenth Amendment to the Constitution and Article I, § 2 of the Michigan Constitution.