PLETZ v SECRETARY OF STATE

Docket No. 60613. Submitted October 6, 1982, at Lansing.—Decided
    May 3, 1983. Leave to appeal denied, 417 Mich 1100.20.

Frances Pletz and several others brought an action against the
    Secretary of State and the Attorney General, seeking a declara-
    tory judgment regarding the constitutionality of 1978 PA 472,
    an act regulating the activities of lobbyists and lobbying organi-
    zations. The Ingham Circuit Court, Robert Holmes Bell, J., held
    that the act was unconstitutional in its entirety and issued a
    declaratory judgment to that effect which included an injunc-
    tion against enforcement of the act. Defendants appeal. *Held:*

    1. The act is not, in its entirety, vague on its face or
    overbroad. The declaratory judgment is set aside.

    2. The act does not violate the title-object clause of the
    Michigan Constitution. The act relates only to lobbying activi-
    ties.

    3. The terms "lobbying" and "influencing" as used in the act
    are not impermissibly vague, nor are the meanings of "quasi-

REFERENCES FOR POINTS IN HEADNOTES
[1] 20 Am Jur 2d, Courts §§ 75, 189.
[2] 73 Am Jur 2d, Statutes § 119 *et seq.*
[3, 4] 51 Am Jur 2d, Lobbying §§ 1, 14.
    73 Am Jur 2d, Statutes §§ 223 *et seq.,* 346.
    Validity and construction of state and municipal enactments regu-
    lating lobbying. 42 ALR3d 1046.
[5, 7, 9-11] 51 Am Jur 2d, Lobbying § 14.
[5] 73 Am Jur 2d, Statutes §§ 195, 346.
[6, 7] 73 Am Jur 2d, Statutes § 155 *et seq.*
[8] 73 Am Jur 2d, Statutes § 433 *et seq.*
    Supreme Court's view as to overbreadth of legislation in connection
    with first Amendment rights. 45 L Ed 2d 725.
[11] 73 Am Jur 2d, Statutes § 346.
[12] 73 Am Jur 2d, Statutes §§ 145, 146, 265.
[13] 1 Am Jur 2d, Administrative Law § 101 *et seq.*
[14] 2 Am Jur 2d, Administrative Law § 463 *et seq.*
[15] 73 Am Jur 2d, Statutes § 315.
[16, 17] 16 Am Jur 2d, Constitutional Law § 260 *et seq.*
    73 Am Jur 2d, Statutes §§ 265, 383.

judicial" or "brief". These terms have readily discernible meanings.

4. The state has a compelling interest in the registration, regulation and accountability of lobbyists. The means employed by the act for such regulation are not unconstitutionally overbroad.

5. The act's prohibition against a lobbyist making a loan to a public official does not apply to the credit sale of goods by retail sellers, since such a credit sale is not a loan.

6. The exemption from the act of "working members" of the press is not an unconstitutional denial of equal protection, since communications with public officials for the purpose of gathering news and information for dissemination are not made to influence administrative or legislative action.

7. Those sections of the act which require disclosure of the identities of persons who contribute to lobbying organizations or lobbying agents are an unconstitutional infringement upon the right of free association. Those sections are therefore stricken from the act.

8. The Secretary of State must obtain a warrant before conducting a valid inspection of a lobbyist's records pursuant to the act.

9. The act does not impose vicarious liability upon individuals whose participation in lobbying organizations is limited to contributing funds.

10. The rules challenged by the plaintiffs are not invalid for the reasons put forward by the plaintiffs. However, the plaintiffs are not precluded from challenging the rules pursuant to the administrative procedures provided by the rules themselves and seeking declaratory rulings regarding specific states of facts.

11. The act is interpreted to exclude churches and religious institutions from its coverage.

12. The portions of the act which are invalid are severable from the valid portions of the act.

Reversed in part, affirmed in part, and remanded.

1. COURTS — SUPREME COURT — ADVISORY OPINIONS.

An advisory opinion of the Supreme Court is not binding precedent, but should be adhered to where appropriate.

2. STATUTES — CONSTITUTIONAL LAW — TITLE-OBJECT CLAUSE.

A court must look to the body of a legislative act to determine whether the act embraces more than one object, which shall be expressed in the title of the act (Const 1963, art 4, § 24).

3. STATUTES — LOBBYISTS.

> The definition of lobbying as "for the purpose of influencing" legislative or administrative action, as used in the Michigan lobbying statute, is not unconstitutionally vague or ambiguous (MCL 4.415; MSA 4.1704[5]).

4. WORDS AND PHRASES — QUASI-JUDICIAL — LOBBYISTS.

> The term quasi-judicial applies to the actions of public administrative officers who are required to investigate or ascertain facts, draw conclusions from them and to exercise discretion of a judicial nature in performing their official actions; the term is not unconstitutionally vague as it is used in an exemption for such actions contained in the Michigan lobbying statute (MCL 4.412; MSA 4.1704[2]).

5. STATUTES — LOBBYISTS — FILING REQUIREMENTS.

> The requirement of the Michigan lobbying statute that a lobbyist must file periodically a brief description of the lobbying activities engaged in is not vague, ambiguous or misleading (MCL 4.418[1][d]; MSA 4.1704[8][1][d]).

6. STATUTES — REASONS FOR A STATUTE.

> A legislative body is not required to articulate its reasons for enacting a statute.

7. CONSTITUTIONAL LAW — LOBBYISTS — COMPELLING STATE INTEREST.

> The regulation of lobbyists is justified by a compelling state interest in apprising the electorate of the sources and extent of financial influences upon government officials.

8. CONSTITUTIONAL LAW — FIRST AMENDMENT RIGHTS — STANDING.

> A litigant may challenge legislation that limits the exercise of First Amendment rights even if his own rights of free expression are not violated because the presence of the legislation may inhibit those not before the court from exercising constitutionally protected speech.

9. SALES — TIME PRICE DIFFERENTIAL — LOBBYISTS — LOANS TO PUBLIC OFFICIALS.

> A "time price differential", where goods are sold at retail on credit for a higher time price than for a cash transaction, is not tantamount to a loan; thus, the statutory prohibition against a lobbyist making a loan to a public official does not apply to the credit sale of goods by retail sellers (MCL 4.421[2]; MSA 4.1704[11][2]).

10. STATUTES — LOBBYISTS — NEWS GATHERING.

   Communications with public officials for the purpose of gathering and disseminating news is outside the coverage of the Michigan lobbying act (MCL 4.415[7][a]; MSA 4.1704[5][7][a]).

11. STATUTES — LOBBYISTS — RIGHT OF FREE ASSOCIATION.

   The provision of the Michigan lobbying act which requires a registered lobbying organization or lobbyist agent to disclose the identities of their members unconstitutionally infringes upon the right of free association (MCL 4.417[1][c], 4.417[2][d]; MSA 4.1704[7][1][c], 4.1704[7][2][d]).

12. STATUTES — LOBBYISTS — JUDICIAL CONSTRUCTION.

   A reviewing court should, if possible, construe a statute in such fashion as to give it validity and a reasonable operation; therefore, because it is logical to assume that the Legislature was aware of the constitutional prohibitions against searches and seizures without a warrant when enacting the lobbying act, the Secretary of State is required to obtain a warrant prior to inspection of a lobbyist's records pursuant to the act (MCL 4.419[1]; MSA 4.1704[9][1]).

13. ADMINISTRATIVE LAW — RULES.

   The Legislature may authorize an administrative agency to make rules and regulations necessary to effect the purposes of a legislative act.

14. ADMINISTRATIVE LAW — DECLARATORY RULINGS — REVIEW.

   An administrative agency may issue a declaratory ruling in regard to the application to an actual state of facts of a rule or order of the agency or a statute administered by the agency; where an agency refuses to issue a declaratory ruling in answer to a proper request, that refusal is subject to judicial review (MCL 24.263; MSA 3.560[163]).

15. RELIGIOUS CORPORATIONS AND ASSOCIATIONS — LOBBYISTS — STATUTES.

   The .Michigan lobbying statute creates excessive and enduring entanglements between state government and religious institutions; therefore, the statute must be interpreted to except churches and religious institutions from its coverage and application.

16. STATUTES — SEVERABILITY — JUDICIAL CONSTRUCTION.

   Statutes should be interpreted to sustain their constitutionality when it is possible to do so, upholding those portions which are severable from provisions found to be repugnant.

17. STATUTES — SEVERABILITY — JUDICIAL CONSTRUCTION.
   The valid portion of a statute must be independent of the stat-
   ute's invalid portions, forming a complete act within itself, to
   be capable of separate enforcement; after severance, the law to
   be enforced must be reasonable in view of the statute as
   originally drafted.

*Honigman, Miller, Schwartz & Cohn* (by *James K. Robinson* and *Norman C. Ankers), McLellan, Schlaybaugh & Whitbeck* (by *Richard D. McLellan, Rex E. Schlaybaugh* and *William J. Perrone),* and *Miller, Canfield, Paddock & Stone* (by *John D. Pirich* and *Brian A. Kaser),* for plaintiffs.

*Stuart D. Hubbell,* for intervening plaintiffs Jack Watters and others.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, *Eugene Krasicky* and *George H. Weller,* Assistants Attorney General, for defendants.

Amicus Curiae:

*Clark, Klein & Beaumont* (by *Dwight H. Vincent, John F. Burns, David H. Paruch, Eileen Drake* and *Thomas D. Nolan),* for Michigan Manufacturers Association, Employees Association of Detroit, Jackson Area Manufacturers Association, and Manufacturers and Employers Association of West Michigan.

Before: BEASLEY, P.J., and ALLEN and W. S. WHITE,* JJ.

BEASLEY, J. This case involves an attack on the constitutionality of the 1978 lobbying statute. Specifically, on April 30, 1981, plaintiffs, Frances Pletz, *et al.,* filed a complaint against defendants,

* Circuit judge, sitting on the Court of Appeals by assignment.

Secretary of State and Attorney General of the State of Michigan, seeking a declaratory judgment regarding the constitutionality of 1978 PA 472,[1] a comprehensive act dealing with lobbying (hereinafter referred to as the act). Accompanying the complaint were 35 affidavits of various persons, some acting in personal capacities and others as representatives of groups. In each instance, the affidavit details the facts and circumstances giving rise to that person's claim that the act is unconstitutional. On May 15, 1981, defendants filed a motion for summary judgment pursuant to GCR 1963, 117.2(3). After receiving briefs and hearing oral argument, the trial judge filed a written opinion on September 30, 1981, declaring the act unconstitutional in its entirety. On October 5, 1981, a declaratory judgment, which recited there was no material fact in dispute and which included a permanent injunction, was entered. From this judgment, defendants appeal as of right.

The history is that in 1975 the Legislature enacted a lobby law, which was part of 1975 PA 227, to replace the earlier 1947 PA 214. This 1975 law did not go into effect because the Political Reform Act, 1975 PA 227, of which the lobby law was a part, was held to violate the title-object clause of the Michigan Constitution.[2]

In the advisory opinion rendered on March 29, 1976, and reported in 396 Mich 123, the Supreme Court held that statutes found unconstitutional for violation of the title-object clause[3] are not severable and, therefore, the whole act was void. Nevertheless, the Supreme Court responded to the remaining nine certified questions concerning which

---

[1] MCL 4.411 et seq.; MSA 4.1704(1) et seq.

[2] Advisory Opinion on Constitutionality of 1975 PA 227 (Question 1), 396 Mich 123; 240 NW2d 193 (1976).

[3] Const 1963, art 4, § 24.

the House of Representatives had requested an advisory opinion. Those responses are reported in 396 Mich 465; 242 NW2d 3 (1976). In the latter opinion, we note the Supreme Court's following statement:

"An advisory opinion is not precedentially binding upon the Court and represents only the opinions of the parties signatory." 396 Mich 477.

While, as indicated, the advisory opinion is not binding precedent, we utilize it as a starting point in our analysis and, where appropriate, adhere to it.[4]

The current legislation, based largely on the 1975 lobbying law, was enacted on October 19, 1978, and was to take effect six months after the promulgation of rules by the Secretary of State. As a result of these rules being filed on December 16, 1980, the act was to take effect on June 17, 1981.

Plaintiffs are corporations, nonprofit corporations, and individuals that engage in activities defined as lobbying under the act or contribute to organizations which engage in lobbying. In their complaint for a declaratory judgment and permanent injunction, plaintiffs raised myriad challenges to the act based on the many affidavits.

In its written opinion, the trial court addressed some of the issues raised by plaintiffs and held, among other things, that the act was unconstitutional on account of: (1) vagueness, (2) impermissible interference with the practice of law, (3) overbreadth, (4) denial of equal protection, and (5) infringement upon First Amendment rights of association.

---

[4] An advisory opinion may not be binding precedent, but discretion tells us not to disregard it.

In concluding the act was unconstitutional, among other things, the trial judge utilized two broad constitutional categories. First, he looked to First Amendment rights and concluded the act was "overbroad". He reasoned that since fundamental rights of freedom of speech and association (*i.e.,* First Amendment rights) were involved, only a statutory purpose encompassing a compelling articulated state interest would be constitutional. Also, he said that the only means of carrying out the compelling state interests would be the least intrusive available.

Second, he looked to the federal and state "due process" clauses which prohibit vagueness in criminal statutes. The constitution requires a criminal statute to be definite so that a person of ordinary intelligence can understand what conduct is forbidden.

Here, we deal with a facial attack on the constitutionality of the act. No complaint has yet been made by the Secretary of State or Attorney General against any particular individual, agency, or institution for alleged violations of the act. As indicated, the matter is before us on appeal from the trial court's grant of a declaratory judgment in favor of plaintiffs holding that the act is unconstitutional in its entirety.

In the 1976 advisory opinion, certified question IX, entitled "Lobby Disclosure: Free Speech," the Court dealt with these constitutional challenges, saying:

"The right of freedom of speech, of association, the right to consult for the common good, to instruct representatives, to petition the government, are all fundamental. As we have indicated elsewhere in this opinion, when the government seeks to regulate a fundamental right, the regulation may be upheld only if justified by

a compelling state interest. While requiring lobbyists to disclose information constitutes regulation of fundamental rights, compelling state interest justifies such regulation. Both the electorate and public officials have a right to be informed of those interests represented by lobbyists. The constitutionality of legislation regulating the activities of lobbyists has been upheld by the United States Supreme Court. *United States v Harriss,* 347 US 612; 74 S Ct 808; 98 L Ed 989 (1954). However, those challenging the constitutionality of Michigan's act argue that when chapter 5 is closely scrutinized it is vague and overbroad.

"Because criminal penalties attach to violations of this statute, fair notice must be provided to a person of ordinary intelligence as to the conduct proscribed. The Michigan statute sufficiently delineates the type of conduct regulated: (1) that a person spend more than $1,000 in a 12-month period; (2) communicating directly with an executive branch or legislative official; or (3) soliciting others to such communication; and that (4) such communication be for the purpose of influencing legislative or administrative action. The statute is more descriptive of the types of communication regulated than the Federal lobbying act discussed in *Harriss, supra.* Legislative and administrative actions are sufficiently defined in §§ 12(1) and 2(1), respectively. Thus, we conclude that chapter 5 is sufficiently specific to withstand a vagueness challenge.

"The statute upheld in *Harriss* differs from the Michigan act in two respects:

"First, the Federal lobbying act as construed by the United States Supreme Court in *Harriss* covered only the so-called professional lobbyists. Chapter 5 requirements of the Michigan legislation apply not only to those who are paid or pay others, but also those who lobby in their own behalf, provided their expenditures for such activities exceed $1,000. Second, unlike the Federal lobbying act, the requirements of chapter 5 are not restricted to direct communications between the lobbyist or lobbyist agent and the public official. Under § 12(3) lobbying is also defined as 'soliciting others to communicate with an official in the executive branch or

an official in the legislative branch for the purpose of influencing legislative or administrative action'.

"In our opinion, the rights 'of legislators, public officials and the public to know the source of monies expended to influence governmental action applies equally to professional lobbyists and those representing their own interests. By imposing the $1,000 threshold, the Legislature has helped to insure that only significant expenditures need be disclosed. In order to avoid manifest overbreadth, however, the words 'soliciting others to communicate' with an official 'for the purpose of influencing legislative or administrative action' must be interpreted to mean express and direct requests to so communicate. Even as so construed, the validity of restraints placed upon such requests is more appropriately tested in the factual context of an actual case or controversy." 396 Mich 513-515.

While, as indicated, we are aware that the advisory opinion is not binding precedent, we choose to adopt it and follow it here. In most respects, the new lobbying act is similar to the former act that was referred to in the cited portions of the advisory opinion

Consequently, consistent with the cited portion of the 1976 advisory opinion, we reverse the trial court's finding that the act is facially vague and overbroad in its entirety. In this connection, we are also aware of the necessity to weigh and balance conflicting constitutional rights. Two cases that deal with this subject and which bear careful review here are *Buckley v Valeo*[5] and *Smith v Goguen.*[6]

In *Buckley,* the United States Supreme Court considered the conflict between the Federal Election Campaign Act of 1971 and First Amendment rights of freedom of political expression and politi-

[5] 424 US 1, 24-26; 96 S Ct 612; 46 L Ed 2d 659 (1976).

[6] 415 US 566; 94 S Ct 1242; 39 L Ed 2d 605 (1974).

cal association. The Court upheld the basic power of Congress to legislate in the area of political election campaigns, but held unconstitutional as an impermissible burden on the First Amendment freedoms the specific limitations on personal expenditures by a candidate and on expenditures by individuals and groups.

In *Goguen,* the United States Supreme Court gave consideration to whether there should be a distinction between "on the face" and "as applied" vagueness attacks on constitutionality, and said:

"Where a statute's literal scope, unaided by a narrowing state court interpretation, is capable of reaching expression sheltered by the First Amendment, the doctrine demands a greater degree of specificity than in other contexts." (Footnote omitted.)[7]

These cases point up, among other things, the fact that such issues are better tested in the factual context of an actual case or controversy.[8]

While the effect of our ruling is to set aside the trial court's grant of declaratory judgment and to remand this case to the trial court for further proceedings in accordance with this opinion, we comment on some of the specific issues argued by the parties and commented on by the trial court.

I

Plaintiffs attack the act as violative of the title-object clause[9] of the Michigan Constitution, which provides: "No law shall embrace more than one

---

[7] 415 US 573.

[8] "Even as so construed, the validity of restraints placed upon such requests is more appropriately tested in the factual context of an actual case or controversy." *Advisory Opinion 1975 PA 227, supra,* p 515.

[9] Const 1963, art 4, § 24.

object, which shall be expressed in its title." In particular, plaintiffs contend that the act unconstitutionally embraces unrelated subjects: campaign contributions, the practice of law, lobbying, and conflicts of interest. The title of the act provides:

"AN ACT to regulate political activity; to regulate lobbyists, lobbyist agents, and lobbying activities; to require registration of lobbyists and lobbyist agents; to require the filing of reports; to prescribe the powers and duties of the department of state; to prescribe penalties; and to repeal certain acts and parts of acts."

In *People ex rel Drake v Mahaney*,[10] the Supreme Court elaborated upon the constitutional prohibition against an act's embracing more than one object:

"But it is insisted that the whole law is unconstitutional and void, because in violation of section twenty of article four of the constitution, which provides that 'no law shall embrace more than one object, which shall be expressed in its title.' The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the state. It was scarcely more so, however, than another practice, also intended to be remedied by this provision, by which, through dexterous management, clauses were inserted in bills of which the titles gave no intimation, and their passage secured through legislative bodies whose members were not generally aware of their intention and effect."

[10] 13 Mich 481, 494-495 (1865).

We are guided by the language contained in *Attorney General v Union Guardian Trust Co:*[11]

" 'While the object of an act must be expressed in the title, it is to the body of the act that the court must look to determine whether it embraces more than one object.

" 'The object of a law is the aim or purpose of the enactment, and it may authorize the doing of all things which may fairly be regarded as in furtherance of the general object of the enactment.' "

We do not believe that the act includes diverse subjects; rather, as the title states, it relates only to lobbying activities. Section 4(1)(a), MCL 4.414(1)(a); MSA 4.1704(4)(1)(a), expressly excludes the subject of campaign contributions from the purview of the act:

"Sec. 4. (1) 'Gift' means a payment, advance, forebearance, or the rendering or deposit of money, services, or anything of value, the value of which exceeds $25.00 in any 1-month period, unless consideration of equal or greater value is received therefor. Gift does not include:

"(a) A campaign contribution otherwise reported as required by Act No. 385 of the Public Acts of 1976, as amended, being sections 169.201 and 169.282 of the Michigan Compiled Laws."

Plaintiffs contend that § 11(4), which forbids public officials (other than members of certain boards or commissions) from accepting compensation for personally engaging in lobbying, should have been made part of another statute, particularly, the statute applicable to conflicts of interests of public officials.[12] We do not agree. The provision of the act which prohibits public officials from

---

[11] 273 Mich 554, 558-559; 263 NW 866 (1935).

[12] MCL 15.301 *et seq.;* MSA 4.1700(21) *et seq.*

engaging in lobbying activities is applicable to both lobbying and conflicts of interests, as it seeks to restrict the class of persons who legally may act as lobbyists. The provision is in furtherance of the general object of the act.

Likewise, we do not find that the act attempts to regulate the practice of law. The act treats attorneys who lobby in an identical manner as non-lawyers, except the act, in § 2(1), specifically does not govern attorneys' communications with officials in administrative agencies. Attorneys whose activities relate to the practice of law, for example involvement in a quasi-judicial determination (administrative law), do not fall under the ambit of the act.

We conclude that the act does not violate the title-body, one-object doctrine of the constitution. The object embraced by the statute is expressed in the title, and the act does not include more than one object.

II

In finding that the act was unconstitutional, the trial court held that the term "public official" [§ 6(2)] and the requirement that a lobbyist furnish a "brief" description of his lobbying activities [§ 8(1)(d)] were impermissibly vague. Two other challenges for vagueness raised by plaintiffs were directed at the term "lobbying" [§ 5(2), (3)] and the exemption from the act for "quasi-judicial determinations" [§ 2(1)].

In *Woll v Attorney General,*[13] the Supreme Court stated that vague laws are objectionable on the grounds that inadequate guidance is provided to an individual whose conduct is regulated and to

[13] 409 Mich 500, 544; 297 NW2d 578 (1980).

the triers of fact. In *Grayned v City of Rockford,*[14] the United States Supreme Court enumerated the principles that are offended by vague laws:

"First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory application. Third, but related, where a vague statute 'abut[s] upon sensitive areas of basic First Amendment freedoms,' it 'operates to inhibit the exercise of [those] freedoms.' Uncertain meanings inevitably lead citizens to ' "steer far wider of the unlawful zone" * * * than if the boundaries of the forbidden areas were clearly marked.' " (Footnotes omitted.)

Plaintiffs maintain that the definition of lobbying as "for the purpose of influencing" is vague and ambiguous. Subsections 5(2) and 5(3) of the act set forth the definitions of lobbying and influencing:

"(2) 'Lobbying' means communicating directly with an official in the executive branch of state government or an official in the legislative branch of state government for the purpose of influencing legislative or administrative action. Lobbying does not include the providing of technical information by a person other than a person as defined in subsection (5) or an employee of a person as defined in subsection (5) when appearing before an officially convened legislative committee or executive department hearing panel. As used in this

---

[14] 408 US 104, 108-109; 92 S Ct 2294; 33 L Ed 2d 222 (1972).

subsection, 'technical information' means empirically verifiable data provided by a person recognized as an expert in the subject area to which the information provided is related.

"(3) 'Influencing' means promoting, supporting, affecting, modifying, opposing or delaying by any means, including the providing of or use of information, statistics, studies, or analysis."

In *New Jersey State Chamber of Commerce v New Jersey Election Law Enforcement Comm,*[15] an action in which the constitutionality of that state's campaign act was challenged, the court defined the phrase "to influence legislation":

"Accordingly, we conclude that the meaning to be ascribed to this terminology is activity which consists of direct, express, and intentional communications with legislators undertaken on a substantial basis by individuals acting jointly for the specific purpose of seeking to affect the introduction, passage, or defeat of, or to affect the content of legislative proposals."

The act's definition of lobbying closely parallels the New Jersey court's definition. We find that the terms lobbying and influence are sufficiently clear so that a reader of the definitions would not have to speculate concerning their meanings.

We also conclude that the term quasi-judicial is not unconstitutionally vague. The term appears in § 2(1) as an exemption to activities that constitute lobbying under the act, providing:

" 'Administrative action' means the proposal, drafting, development, consideration, amendment, enactment, or defeat of a nonministerial action or rule by an executive agency or an official in the executive branch of state government. Administrative action does not

---

[15] 82 NJ 57, 79; 411 A2d 168 (1980).

include a quasi-judicial determination as authorized by law."

Lobbying, which, among other things, is defined as communicating directly with an official for the purpose of influencing administrative action, does not include quasi-judicial determinations as authorized by law. Plaintiffs claim that the act does not reveal the types of administrative activities that fall within the ambit of "quasi-judicial" determinations.

The design of this exemption is to remove from the act's coverage communications made and activities undertaken by attorneys during the course of contested administrative matters. The term "quasi-judicial" has a readily discernible meaning; it appears in Const 1963, art 6, § 28 and was defined in *People ex rel Clardy v Balch:*[16]

"When the power is conferred by statute upon a commission such as the public utilities, or a board such as the department of labor and industry, to ascertain facts and make orders founded thereon, they are at times referred to as *quasi*-judicial bodies, but their members are in no sense judicial officers within the meaning of that term as used in the exception in the constitutional provision. It clearly refers to the judicial officers provided for therein."

Black's Law Dictionary provides a definition of quasi-judicial:[17]

"A term applied to the action, discretion, etc., of public administrative officers, who are required to investigate facts, or ascertain the existence of facts, and

---

[16] 268 Mich 196, 200; 255 NW 762 (1934). See, also, *In re Fredericks,* 285 Mich 262, 265-266; 280 NW 464 (1938).

[17] Black's Law Dictionary (4th ed), p 1411 (1968).

draw conclusions from them, as a basis for their official action, and to exercise discretion of a judicial nature."

Thus, we do not believe the term "quasi-judicial" is unconstitutionally vague. We consider that the exemption removes contested matters before administrative officers, such as referees, hearing officers and commissions, from the scope of the lobby law.

The trial court found the word "brief" to be unconstitutionally vague. The word appears in the reporting section of the act, § 8(1)(d), requiring lobbyists or lobbyist agents to file a "brief description of the lobbying activities engaged in during the previous reporting period". In regard to this issue, the trial court held:

"The reporting requirements of § 8(1) of the act prescribe the inclusion of specific information concerning expenditures made by the lobbyist or lobbyist agent while lobbying and in subsection (d) additionally require 'A brief description of the lobbying activities engaged in during the previous reporting period'. The act contains no further clarification of what constitutes a brief description. Therefore, the registrants potential failure to elaborate upon activity to the extent of being 'brief' by a standard not enumerated within the act brings with it a risk of prosecution. *Smith v Goguen, supra.* This potential chilling of a citizen's right of expression by the vagueness and apprehension it creates is unconstitutional."

Brief has been defined as:

"1. of short duration or extent 2. Short in length 3. using relatively few words; concise."[18]

We do not find the requirement of filing a brief

---

[18] *New World Dictionary (2d College ed)* (1974), pp 176-177.

description to be vague, ambiguous, or misleading. It is readily discernible to a lobbyist or lobbyist agent that the required report should contain a concise, rather than a protracted, description of the lobbying activities for the period. Accordingly, we find that the trial court erred in holding § 8(1)(d) of the act unconstitutionally vague.

## III

The trial court struck down the act for, among other reasons, its finding that the act is overbroad and its conclusion that the act did not employ the least intrusive means. In part, this holding was based on a conclusion that, although First Amendment rights were involved, the act did not contain an articulated statutory purpose. The trial court delineated illustrations of the sections it deemed overbroad, as follows:

"1. Section 8(1)(c) of the act requires the reporting of financial transactions between a lobbyist or a lobbying agent (as the act defines those terms) and any public official (again, as the act defines that term) where the amount involved is greater than $500. There are no requirements that the amounts be even remotely related to lobbying or that the lobbyist with regard to that expenditure have attempted any communication with the public official relating to any governmental business. This section sweeps within its definition all matters between persons based upon their even one time position and requires detailed records be kept with resultant disclosure.

"2. Section 11(2) of the act prohibits a lobbyist or lobbyist agent from making a gift or loan (as that term is defined) other than a loan in the normal course of business of an institution. The criminal penalty by gradation of amount of the loan is provided in the law. Clearly, this broad language has little to do with the regulation or disclosure of lobbying activity if a loan

made by a lobbyist to a friend not a public official or a gift made to a charity is completely prohibited. Importantly, this section is a prohibition and not regulation.

"3. Sections 7 and 8 of the act require registration by a lobbyist and/or lobbyist agent within 15 days after qualifying as such and require a twice yearly reporting of past activities. Rule 2 MAC 4.412 enacted pursuant to the act requires that all records be made of contacts of the registrant with public officials for a period prior to the actual coming within the threshold limitations of the act defining a lobbyist or a lobbying agent. The resultant requirement is that the citizen who contacts a public official is required to maintain records 'just in case' he passes the financial threshold for registration. Nothing can be observed to do more to chill a citizen's right to seek redress of his government than the interpretation given by the Rule 2 of the broadly worded §§ 7 and 8.

"4. Section 8(b)(iii) of the act and Rule 1 MAC 4.411(d)(iv) require the disclosure of all expenditures for lobbying but define these expenditures by rule as including those that would not have been incurred but for the activity of communicating directly. Certainly, this broadly worded language goes so far beyond the legitimate disclosure of those activities directly related to the communication which the act can legitimately regulate as to require that a lobbyist or lobbyist agent must divulge virtually his entire business records for fear lack of disclosure will subject him to the criminal penalties within the act."

With respect to the trial court's assertion that the act does not articulate a statutory purpose, the purpose of the act is expressed in its title:

"AN ACT to regulate political activity; to regulate lobbyists, lobbyist agents, and lobbying activities; to require registration of lobbyists and lobbyist agents; to require the filing of reports; to prescribe the powers and duties of the department of state; to prescribe penalties; and to repeal certain acts and parts of acts."

We note that the United States Supreme Court has held that a legislative body is not required to articulate its reasons for enacting a statute.[19]

Our Supreme Court and the courts of various other states have held that a state has a compelling interest in the registration, regulation, and accountability of lobbyists.[20] The Washington Supreme Court has commented on the importance of the electorate being apprised of the sources and extent of financial influences upon governmental officials.[21]

In *United States v Harriss*,[22] former Chief Justice Earl Warren eloquently stated the case for regulation of lobbyists:

"Present-day legislative complexities are such that individual members of Congress cannot be expected to explore the myriad pressures to which they are regularly subjected. Yet full realization of the American ideal of government by elected representatives depends to no small extent on their ability to properly evaluate such pressures. Otherwise the voice of the people may all too easily be drowned out by the voice of special interest groups seeking favored treatment while masquerading as proponents of the public weal. This is the evil which the Lobbying Act was designed to help prevent.

"Toward that end, Congress has not sought to prohibit these pressures. It has merely provided for a modicum of information from those who for hire attempt to influence legislation or who collect or spend

[19] *United States Railroad Retirement Board v Fritz,* 449 US 166, 179; 101 S Ct 453; 66 L Ed 2d 368 (1980).

[20] See, *e.g., Advisory Opinion on Constitutionality of 1975 PA 227 (Questions 2-10),* 396 Mich 465, 513-515; 242 NW2d 3 (1976) (dictum); *New Jersey State Chamber of Commerce v New Jersey Election Law Enforcement Comm,* 82 NJ 57, 73-74; 411 A2d 168 (1980); *Montana Automobile Ass'n v Greely,* 632 P2d 300, 303 (Mont, 1981).

[21] *Fritz v Gorton,* 83 Wash 2d 275, 302-311; 517 P2d 911 (1974), *app dis* 417 US 902; 94 S Ct 2596; 41 L Ed 2d 208 (1974).

[22] 347 US 612, 625; 74 S Ct 808; 98 L Ed 989 (1954).

funds for that purpose. It wants only to know who is being hired, who is putting up the money, and how much." (Footnote omitted.)

We are in accord with these views and hold that a compelling state interest justifies the regulation of lobbyists.

In *Buckley v Valeo, supra,* the United States Supreme Court held that a state may restrict the First Amendment rights of lobbyists if it uses closely drawn means to avoid unnecessary infringements of constitutional freedoms. Here, the trial court held that the measures employed by the act are overbroad, since they are more intrusive than necessary to accomplish the aims which they serve.

The overbreadth doctrine allows a litigant to challenge legislation that limits the exercise of First Amendment rights even if his own free expression rights are not violated.[23] Litigants are permitted to challenge allegedly overbroad statutes because the presence of the legislation may inhibit those not before the court from exercising constitutionally protected speech.[24]

In *Gooding v Wilson,*[25] the purpose of the overbreadth doctrine was enunciated:

"The constitutional guarantees of freedom of speech forbid the States to punish the use of words or language not within 'narrowly limited classes of speech.' * * * Even as to such a class, however, because 'the line between speech unconditionally guaranteed and speech

[23] *Dombrowski v Pfister,* 380 US 479, 486; 85 S Ct 1116; 14 L Ed 2d 22 (1965); *Woll v Attorney General,* 409 Mich 500, 534; 297 NW2d 578 (1980).

[24] *Gooding v Wilson,* 405 US 518, 520-521; 92 S Ct 1103; 31 L Ed 2d 408 (1972); *Broadrick v Oklahoma,* 413 US 601, 610-612; 93 S Ct 2908; 37 L Ed 2d 830 (1973).

[25] *Gooding, supra,* pp 521-522.

which may legitimately be regulated, suppressed, or
punished is finely drawn,' * * * '[i]n every case the
power to regulate must be so exercised as not, in
attaining a permissible end, unduly to infringe the
protected freedom,' * * *. In other words, the statute
must be carefully drawn or be authoritatively construed
to punish only unprotected speech and not be suscepti-
ble of application to protected expression. 'Because First
Amendment freedoms need breathing space to survive,
government may regulate in the area only with narrow
specificity.' " (Citations omitted.)

The trial court held that § 8(1)(c), which requires
the reporting of financial transactions of $500 or
more between a lobbyist or lobbyist agent and a
public official, was overbroad on account of the
lack of necessity for the expended funds to relate
to communications for the purpose of influencing
governmental business. We disagree with this
holding, since a transaction between lobbyists and
public officials, even where unrelated to a particu-
lar policy issue, may affect the recipient's inclina-
tion on matters of interest to the lobbyist. We
believe that the intent of the act would be
thwarted if a transaction between a public official
and a lobbyist did not require accountability as
long as it supposedly related to a nonlobbying
matter.[26]

It may well be that situations will exist or will
arise where it will be necessary for exemptions to
be promulgated by rule. However, we do not be-
lieve that possibility requires a finding that this
section of the act is unconstitutional.

Another basis for the trial court's conclusion
that the act is unconstitutionally overbroad con-
cerned § 11(2), which forbids a lobbyist or lobbyist
agent from lending money to a public official other

---

[26] See *Fritz v Gorton, supra.*

than a loan made in the normal course of an institution's business:

"(2) A lobbyist or lobbyist agent or anyone acting on behalf of a lobbyist or lobbyist agent shall not give a gift or loan, other than a loan made in the normal course of business by an institution as defined in section 5 of Act No. 319 of the Public Acts of 1969, as amended, a national bank, a branch bank, an insurance company issuing a loan or receiving a mortgage in the normal course of business, a premium finance company, a mortgage company, a small loan company, a state or federal credit union, a savings and loan association chartered by this state or the federal government, or a licensee as defined by Act No. 27 of the Public Acts of the Extra Session of 1950, as amended. For the purpose of this section, a preferential interest rate shall not be given solely on the basis of the credit applicant being a public official or a member of the public official's immediate family."

Contrary to plaintiffs' position on this issue, the above-quoted section of the act does not prohibit a lobbyist or lobbyist agent from making a gift to an individual who is not in the category of a public official. It would defy credulity to believe that the Legislature intended to forbid lobbyists from making gifts to relatives, friends, or any other non-public official. A reasonable interpretation of this section is that only loans and gifts made by lobbyists or lobbyist agents to public officials are regulated. This section must be read in conjunction with the act's related provisions.[27] In so doing, we interpret the statute to exclude from coverage gifts by lobbyists or lobbyist agents to non-public officials.

Therefore, we find that the trial court erred in

[27] *People v Burns*, 5 Mich 114, 117 (1858); *City of Grand Rapids v Crocker*, 219 Mich 178, 182; 189 NW 221 (1922); 2A Sutherland, Statutory Construction, § 46.05, p 56.

finding that, on this basis, the act is overbroad. Other illustrations set forth by the trial court relate to rules promulgated by the Secretary of State, rather than provisions of the act. Our present inclination is to deal with challenges to the rules on a specific, as-applied basis. Consequently, while we decline to find constitutional overbreadth on the basis of the rules adopted by the Secretary of State and alluded to by the trial court, we do so without prejudice to plaintiffs' right to attack such rules in the manner provided in the act, including the judicial review referred to in the act.[28]

## IV

Plaintiffs also attacked the act on the grounds that it denies equal protection to retailers of consumer goods. Their challenge is based upon § 11(2), the provision which prohibits lobbyists or lobbyist agents from making loans to public officials. The constitutional challenge to this section of the act is in relation to the exemption afforded finance companies, banks, insurance companies, mortgage firms and small loan concerns for loans made in the normal course of business. Plaintiffs asserted, and the trial court agreed, that the act does not embody an exception for retail credit lenders.[29] In agreeing with plaintiffs, the trial court found that no rational basis existed for distinguishing between lending institutions and retail credit lenders.

In analyzing this issue, the trial court overlooked the well-established principle that transac-

---

[28] See MCL 24.263; MSA 3.560(163).

[29] A retail seller is one who sells goods to consumers, normally by small quantities or parcels. A retail seller is distinguishable from a wholesaler, since the property sold is not sold for resale. 77 CJS, Sales, § 1e, p 580; *Svithiod Singing Club v McKobbin,* 381 Ill 194, 198; 44 NE2d 904 (1942).

tions entered into between retailers and their customers in which goods are sold on a credit basis involve a "time price differential", which is not tantamount to a loan. Regarding this principle, we stated in *Price Brothers Co v Charles J Rogers Construction Co:*[30]

"In *Silver v International Paper Co*, 35 Mich App 469, 470; 192 NW2d 535 (1971), *lv den* 386 Mich 764 (1971), time price differential was defined, by way of example, as follows:

" 'Plaintiffs were given the opportunity to either pay cash for the properties or to purchase them on credit. The difference between the higher time price and the cash price is referred to as a "time price differential." '

"As this illustration indicates, the differential is an integral part of the cost of the transaction. If the buyer pays cash, the seller receives the money immediately and no burden is placed on him. If the buyer elects to purchase on credit, the seller is burdened by the interruption to its cash flow, and so the buyer may pay a 'price' for the benefit of receiving the materials without paying for them immediately."

Accordingly, the disparity between a higher time price and cash price is considered a time price differential, not a loan. It must be presumed that the Legislature was aware of the judicial construction of the word "loan" when it incorporated the word into § 11(2). Under these circumstances, it would not appear that the prohibition against a lobbyist making a loan to a public official applies to the credit sale of goods by retail sellers. It may well be that this is a situation where the Secretary of State will wish to promulgate a rule describing conditions in the normal course of business where retailers may extend credit to public officials.

---

[30] 104 Mich App 369, 377; 304 NW2d 584 (1981), *lv den* 412 Mich 938 (1982).

## V

Another constitutional equal protection issue raised by plaintiffs related to the exclusion from the act's coverage of working members of the press. Section 5(7)(a) provides:

"(7) Lobbyist or lobbyist agent does not include:

"(a) A publisher, owner, or working member of the press, radio, or television while disseminating news or editorial comment to the general public in the ordinary course of business."

In connection with the aforecited section, the trial court made the following holding:

"This court is at a loss to know just what a 'working member of the press * * *' really is. In no other section of the act is there mention of this curious phrase. The conclusion is that a non-working member of the press may become a lobbyist or lobbying agent. This apparent exemption is based upon the *identity* of persons, not necessarily upon *activity* of the persons.

"There can be no more fundamental right than that of citizens to publish their views at large. Therefore, any statutory classification which undertakes to discriminate between 'working members of the press * * *' whose dissemination is to the general public and in the ordinary course of business, from those not to the general public and not in the ordinary course of business must necessarily fail. * * * Clearly, therefore, this court must conclude that § 5(7)(a) of the act is an unconstitutional denial of equal protection."

We do not share the trial court's feeling that this language of the act is not susceptible of reasonable interpretation.

We believe that the Legislature intended that communications with public officials for purposes of gathering and disseminating news be outside

the act's coverage. The qualifying word "working" in § 5(7)(a) was added by the Legislature to the exclusion to prevent a person from being improperly accredited as a member of the press in order to avoid the requirements of the law.

The press exemption properly excludes the acts of talking and writing to public officials for purposes of gathering news and information for dissemination. Such communications fall outside of the purview of the statute, since they are not made to influence administrative or legislative action.

While the term "working member" is a rather new expression, it seems clear that the Legislature intended to exempt the news media while disseminating news or editorial comment to the general public in the ordinary course of business. Trade associations that obtain information from public officials in order to impart information to their members are entitled to First Amendment protection to the same extent as a medium which disseminates information to the general public. The crucial element common to both mediums is that communications to public officials were not made "for the purpose of influencing official action".

However, trade associations whose chief reason for being is the "lobbying" of public officials will not fully qualify for the exemption. Likely, some will wish to obtain an advance declaratory ruling from the Secretary of State regarding the extent to which they are exempt, which ruling will be subject to judicial review under the act.[31]

In conformance with this analysis, we reverse the trial court's finding that the media exemption afforded under § 5(7)(a) is an unconstitutional denial of equal protection. In concluding otherwise,

[31] See part IX *infra* of this opinion.

the trial court appeared to be utilizing the Equal Protection Clause in a way far afield from its original purpose. In the late 1930's, it was thought that use of constitutional equal protection and constitutional due process to strike down legislative acts that offended the status quo had been brought to an end. In recent years, some courts seem to have undertaken to revive this pernicious doctrine to strike down legislation that at a particular moment ran counter to the predilections of particular judges. We decline to join that chorus and reject the trial court's findings that these portions of the act are unconstitutional under the Equal Protection Clause.

## VI

Another portion of the statute that was stricken by the trial court was § 7(1)(c), which requires registrants to disclose the identities of persons who contribute to their lobbying organizations. In *NAACP v Alabama*,[32] the United States Supreme Court, first noting the close nexus between freedom of speech and freedom of assembly, held that requiring disclosure of the names and addresses of members and agents was such a restraint upon freedom of association as to constitute a denial of due process. The Court specifically held that the state had not shown a compelling state interest sufficient to justify the deterrent effect on First Amendment rights.

After carefully reviewing this part of the act and the cases[33] dealing with First Amendment freedom of association rights, we affirm the trial

---

[32] 357 US 449, 460; 78 S Ct 1163; 2 L Ed 2d 1488 (1958).

[33] *Id.; NAACP v Button,* 371 US 415; 83 S Ct 328; 9 L Ed 2d 405 (1963); *Bates v Little Rock,* 361 US 516; 80 S Ct 412; 4 L Ed 2d 480 (1960); *Advisory Opinion, supra,* pp 488-489.

court's finding that it is unconstitutional to compel lobbying organizations to submit their membership lists. In applying a strict scrutiny test, we conclude that § 7(1)(c) unconstitutionally infringes upon free association rights.

The disclosure requirement of the act potentially would discourage individuals from associating with organizations devoted to lobbying. The example offered by plaintiffs concerning the Mental Health Association, one of the plaintiffs herein, is of particular insight to our holding that the disclosure provisions unconstitutionally infringe upon freedom of association rights:

"Accordingly, §§ 7(1)(c) and 7(2)(d) of 1978 PA 472, as written, compel the public identification of the members of membership organizations. For example, plaintiff Mental Health Association in Michigan must disclose the names of its members, many of whom are past and present mental health patients. In this regard, the act significantly interferes with the freedom to associate and the right to privacy in one's associations."

Therefore, we strike § 7(1)(c) and § 7(2)(d), which imposes similar duties upon lobbyist agents, from the act. With this result, registrants would have to abide by the registration requirements of the act but would not have to reveal the names, addresses, and business information about persons (which, under the definitions of the act, includes partnerships, businesses and individuals) who give compensation to or reimburse lobbyists or lobbyist agents. For reasons hereinafter set forth, we believe that this holding of unconstitutionality is separable from the act as a whole.

## VII

An issue raised by plaintiffs, but not addressed

by the trial court, concerned a portion of the act, § 9(1), which allegedly authorizes defendant Secretary of State to conduct searches without warrants and seizures of the records of lobbyists and lobbyist agents. The challenged section provides:

"Sec. 9. (1) A lobbyist or a lobbyist agent acting on behalf of the lobbyist, and a lobbyist agent acting on his or her own behalf, shall obtain and preserve all accounts, bills, receipts, books, papers, and documents necessary to substantiate the reports required to be made pursuant to section 8 for 5 years after the report containing those items is filed. These records shall be made available for insepction upon request by the secretary of state after reasonable notice."

Defendants asserts that the act does not empower state officials to conduct unlawful searches, supporting this position by showing that the states which have lobbying laws have inserted warrant requirements in the sections regarding inspections of records. We agree with defendants' analysis of this issue.

When the Legislature enacted the act, it is logical and sensible to presume that it was aware of the constitutional prohibitions against warrantless searches and seizures.[34] If possible, a reviewing court should construe a statute in a fashion to give it validity and a reasonable operation.[35]

In construing a city housing code which lacked a warrant requirement as a precondition for city officials to inspect structures, the Supreme Court,

[34] See *People v Buckley,* 302 Mich 12, 21; 4 NW2d 448 (1942); *Garwols v Bankers Trust Co,* 251 Mich 420, 424-425; 232 NW 239 (1930); 16 Am Jur 2d, Constitutional Law, § 212, pp 631-635.

[35] *In re Petition of State Highway Comm,* 383 Mich 709, 714-715; 178 NW2d 923 (1970); 16 Am Jur 2d, Constitutional Law, § 219, pp 645-651.

in *Camara v Municipal Court of San Francisco,*[36] held that the Fourth Amendment guarantee against unlawful searches and seizures prevented the city from conducting searches without warrants. Similarly, in *Marshall v Barlow's, Inc,*[37] an inspection without a warrant under OSHA was prohibited. Therefore, we interpret the act to require the obtaining of a search warrant as a condition precedent for conducting a valid administrative inspection under § 9(1).

## VIII

Plaintiffs further contend that the act imposes vicarious liability upon individuals whose participation in lobbying organizations is limited to contributing funds. This claim is clearly groundless, as § 5(7)(d) of the act specifically excludes such members of lobbying organizations from the definition of lobbyist or lobbyist agent:

"(7) Lobbyist or lobbyist agent does not include: * * *
"(d) A member of a lobbyist, if the lobbyist is a membership organization or association, and if the member of a lobbyist does not separately qualify as a lobbyist under subsection (4)."

A member of a lobbying organization qualifies as a lobbyist only when he engages in activities that constitute "lobbying", as defined in § 5(2). Absent a direct communication with a public official for the purpose of influencing the official's actions, a member of a lobbying organization cannot be held criminally liable if the organization fails to comply with the strictures of the act.

[36] 387 US 523; 87 S Ct 1727; 18 L Ed 2d 930 (1967).
[37] 436 US 307; 98 S Ct 1816; 56 L Ed 2d 305 (1978).

## IX

Plaintiffs assert that two rules which were promulgated by defendant Secretary of State in connection with the act are invalid. Under § 16, the Secretary of State is directed to promulgate rules and issue directives to effectuate the act.[38]

One of the rules assailed by plaintiffs, Rule 2, 1981 AACS, R 4.412, prescribes:

"Rule 2. When a duty or prohibition is imposed upon a lobbyist or lobbyist agent by the act, that duty or prohibition extends to all employees of those persons who are, or should be, registered as a lobbyist or lobbyist agent under section 7 of the act and extends to all contacts by such persons with public officials. These duties and prohibitions commence as of the date lobbyist or lobbyist agent contracts with or employs a lobbyist agent, or influences or attempts to influence a public official in a manner which shall or should be reflected on a report filed pursuant to section 8 of the act, or makes an expenditure which has a purpose of influencing legislative or administrative action."

Contending that the aforementioned rule directs employees of lobbyists to maintain records of activities related to lobbying even if the lobbyist has not satisfied the act's statutory threshold for becoming a lobbyist, plaintiffs assert that the rule exceeds the scope of the act. This claim is without merit.

Our reading of the rule convinces us that neither it nor the act applies to a person until he qualifies as a lobbyist under the act. The first segment of the rule displays that no duties are imposed until those persons "are, or should be, registered as a lobbyist or lobbyist agent" under the act.

[38] See, generally, The Administrative Procedures Act of 1969, MCL 24.201 *et seq.;* MSA 3.560(101) *et seq.*

It appears that the purpose of the rule is to apply the act to an employee of a lobbyist when he engages in lobbying activities on his own behalf. Thus, if such employees actually lobby in their own right, and in so doing satisfy the act's thresholds, they also are subject to the duties and prohibitions applicable to lobbyists.

Contrary to plaintiffs' argument, we decline to find that Rule 2, 1981 AACS, R 4.412 requires record-keeping functions prior to a person's qualifying as a lobbyist. The trial court erred in holding that the rule is invalid.

The other rule challenged by plaintiffs is the definition of expenditures, as contained in Rule 1(1)(d)(iv), 1981 AACS, R 4.411(1)(d)(iv), which reads:

"(d) 'Expenditures relates to the performance of lobbying' and 'expenditures for lobbying' includes all of the following expenditures of a lobbyist or lobbyist agent: * * *

"(iv) An expenditure for providing or using information, statistics, studies or analysis in communicating directly with an official that would not have been incurred but for the activity of communicating directly."

It is plaintiffs' contention that expenditures made by lobbyists fall under the purview of the act only when they involve direct communications with public officials, and that the act does not apply to expenditures made in preparation of information or studies that are subsequently communicated to the public official. This rule is not beyond the Secretary of State's rule-making authority; it defines as lobbying expenditures funds which would not have been expended other than

for purposes of communicating directly with public officials.

In regard to an act similar to 1978 PA 472, the Montana Supreme Court stated that the purpose of that state's lobby laws is to provide for the disclosure of funds expended to influence the actions of public officials.[39]

We quote with approval from defendants' brief:

"To eliminate the 'but for' rule, 1(d)(iv), is to eliminate information on a major expenditure. With today's complex society and better educated and more sophisticated public officials, it is information, statistics, studies, and analysis that are major tools of the lobbyists and lobbyist agents' art. When the expenditure for the information, statistics, studies, or analyses would not have been incurred but for the direct communication, the expenditure is as much a part of the direct communication as eyeball to eyeball communication."

Thus, we hold that Rule 1(1)(d)(iv), 1981 AACS, R 4.411(1)(d)(iv), is not invalid for the reason that money spent in preparation for communicating with public officials is inextricably part of the activities designed to be regulated by the act, namely, to regulate lobbying activities.

In so holding, with respect to these two rules, we do not intend to deprive plaintiffs of their rights to proceed to challenge these rules under the procedure provided in the act.

The Legislature may authorize an administrative agency, such as the Secretary of State, to make rules and regulations necessary to effectuate the purposes of an act.[40] Pursuant to § 20 of the act, the rules promulgated by the Secretary of

---

[39] *Montana Automobile Ass'n v Greely, supra,* p 311.

[40] See *Coffman v State Board of Examiners in Optometry,* 331 Mich 582, 589-591; 50 NW2d 322 (1951); 1 Am Jur 2d, Administrative Law, §§ 92-93, pp 890-892.

State contain a procedure for interested parties to obtain declaratory rulings regarding the application of the act to an actual state of facts:

"Rule 3. (1) The secretary of state, upon written request of an interested person, may issue a declaratory ruling as to the applicability of the act or these rules to an actual state of facts.

"(2) A request for a declaratory ruling shall contain all of the following information:

"(a) A clear, concise, and complete statement of the actual state of facts upon which a ruling may be based.

"(b) A precise statement of the legal question or issue asked.

"(c) The signature of the interested person making the request.

"(3) If the interested person so desires, the person may submit with the request a brief or other reference to legal authorities upon which the person believes the declaratory ruling should be based.

"(4) The secretary of state shall decline to issue a declaratory ruling in any of the following situations:

"(a) The subject matter of a request is frivolous on its face.

"(b) The statement of actual facts or issues contained in a request is indefinite, incomplete, or lacks specificity.

"(c) The same, or substantially the same, course of action is under investigation or is, or has been, the subject of a currect action, order, judgment, or decree initiated or obtained by the secretary of state, the attorney general, or a prosecuting attorney.

"(5) If the secretary of state declines to issue a declaratory ruling, the interested person making the request shall be notified of the reason for the refusal.

"(6) Each declaratory ruling issued shall contain a statement or findings of fact, a conclusion of law based on all legal authority upon which the department relies for its rulings, if any, and the ruling or determination made.

"(7) Once issued, a ruling is binding on the depart-

ment and shall not retroactively be changed, but nothing in this rule shall prohibit the department from prospectively changing a ruling." 1981 AACS, R 4.413.

In *Greenbriar Convalescent Center, Inc v Dep't of Public Health*,[41] we discussed the functions of declaratory rulings:

"Declaratory rulings under § 63 of the APA serve two distinct purposes. They allow a party to obtain a binding determination of rights from an agency in the nature of a declaratory judgment. This creates greater flexibility for the agency and for those dealing with it. 1 Cooper, State Administrative Law (1965), p 240. The section also allows judicial review of such a declaratory determination. This provides an unparalleled opportunity for judicial review of an agency action without the need to exhaust other administrative remedies. Lebenbom, *Sections 63 & 64: Declaratory Rulings,* 58 Mich St Bar J 398 (1979)."

The declaratory ruling procedure is comprehensive, seemingly encompassing the issue of whether a particular party qualifies as a lobbyist or a lobbyist agent under the act. For example, the affidavit of Gerald Hicks, appended to plaintiffs' complaint, raises two questions concerning whether his activities constitute lobbying within the meaning of the act. In his affidavit, Hicks claimed that he is the Executive Director of the Michigan Federation of Private Child and Family Agencies, a nonprofit corporation consisting of 82 members, and that he is an appointed member of the State Commission on Criminal Justice. He alleged that he is unable to ascertain whether he will be designated as a lobbyist as a result of his activities with the two organizations.

[41] 108 Mich App 553, 561; 310 NW2d 812 (1981), *lv gtd* 412 Mich 870 (1981).

We believe that affiant Hicks, along with other parties who are uncertain about the application of the act, may, and should, seek a declaratory ruling from the Secretary of State under Rule 3. The usage of this procedure is preferable to a preliminary declaratory judgment from the circuit court. In the first instance, the Secretary of State, as the promulgator of the rules, is the preferred source for determining the application of the act to an actual state of facts and perhaps enjoys greater flexibility in developing answers that will accommodate competing interests. Notably, the rules are binding on the Secretary of State and may not be changed retroactively.[42]

MCL 24.263; MSA 3.560(163) provides statutory authority for an agency, such as the Secretary of State, to issue a declaratory ruling in regard to the application to an actual state of facts of a rule or order of the agency or a statute administered by the agency. Here, the act specifically affords a party the right to judicial review of a declaratory ruling in the same manner as a final order or decision of the agency in a contested case.[43] Where an agency refuses to issue a declaratory ruling in answer to a proper request, the refusal to issue the ruling is subject to judicial review.[44]

Consequently, it would appear that under this analysis affiant Hicks and other parties who are similarly uncertain about their status under the act have not exhausted their administrative remedies. In the first instance, they are entitled to a

[42] MCL 24.263; MSA 3.560(163); 1981 AACS, R 4.413(7); 73 CJS, Public Administrative Bodies and Procedure, § 107 pp 428-430.

[43] See *Greenbriar Convalescent Center, Inc v Dep't of Public Health, supra;* Davis, Administrative Law Text (3d ed), § 21.05, pp 410-412.

[44] *Human Rights Party v Michigan Corrections Comm,* 76 Mich App 204, 209-212; 256 NW2d 439 (1977), *lv den* 402 Mich 906 (1978).

declaratory ruling by the Secretary of State and then judicial review by the circuit court of such ruling.

We hold that the foregoing analysis pertains to plaintiffs' challenges to Rules 33(3), 1(d)(iv), and 2. In their complaint, various plaintiffs contended that they are uncertain whether activities which are remotely or incidentally related to lobbying activities are subject to the reporting and record-keeping requirements of the act. Consistent with this opinion, we leave them to this procedure.

## X

A major remaining issue involves the challenge of intervening church entities to the constitutionality of the Lobbying Act as applied to them. The intervening plaintiff church groups maintain that the act violates the First Amendment's freedom of religion clause. Specifically, they contend that if church institutions were required to comply with the act, it would constitute an infringement upon the exercise of religious freedom and privacy, both as to religious institutions and their members.

The interveners agree that religious institutions engage in functions classifiable as "lobbying" under the act. As the affidavit filed on appeal by intervening plaintiffs outlines, church entities frequently communicate directly with public officials to express their views on matters of public concern. Since the religious organizations would qualify as lobbyists, they would be subject to the act's disclosure and record-keeping demands.

In our view, continuing observation and review of religious organizations' documents and records would be necessary for the government to review for evidence of possible lobbying activities. Addi-

tionally, determination of which records are for lobbying and which are for religious purposes would be a continuing difficult chore.

Notably, the 1975 lobbying statute embodied a specific exception for religious organizations.[45] The Michigan Constitution recognizes that religious groups traditionally have been granted special status.[46] We conclude that, insofar as applied to churches and religious institutions, the act violates the First Amendment by creating excessive and enduring entanglements between state government and religious institutions. Consequently, in order to preserve the constitutionality of the act, we interpret it to except churches and religious institutions from its coverage and application.

## XI

Last, we review whether the invalid parts of the act cause the act to be declared unconstitutional in its entirety.

In his opinion, the trial judge concluded that the entire act was unconstitutional, saying:

"It must be concluded that 1978 PA 472 is unconstitutional. Despite the severability clause of § 18 of the act, the nature and extent of the act's constitutional infirmities make its resultant implementation impossible."

Relying on the act's severability clause, § 18, defendants maintain that the Legislature expressly intended to preserve as much of the act as possible. This clause provides:

[45] 1975 PA 227, § 12(6)(f).

[46] Const 1963, art 1, § 4; *In re Frazee,* 63 Mich 396; 30 NW 72 (1886).

"Sec. 18. If any portion of this act or the application of this act to any person or circumstances is found to be invalid by a court, the invalidity shall not affect the remaining portions or applications of this act which can be given effect without the invalid portion or application, if the remaining portions are not determined by the court to be inoperable."

The doctrine of severability holds that statutes should be interpreted to sustain their constitutionality when it is possible to do so.[47] Whenever a reviewing court may sustain an enactment by proper construction, it will uphold the parts which are separable from the repugnant provisions.[48] To be capable of separate enforcement, the valid portion of the statute must be independent of the invalid sections, forming a complete act within itself.[49] After separation of the valid parts of the enactment, the law enforced must be reasonable in view of the act as originally drafted.[50] One test applied is whether the law-making body would have passed the statute had it been aware that portions therein would be declared to be invalid and, consequently, excised from the act.[51]

Here, we uphold all portions of the act from facial attack except for the disclosure require-

[47] *El Paso & Northeastern R Co v Gutierrez,* 215 US 87, 96; 30 S Ct 21; 54 L Ed 106 (1909); Uniform Statutory Construction Act, § 16; 16 Am Jur 2d, Constitutional Law, §§ 260-262, pp 733-739.

[48] 2 Sutherland, Statutory Construction (4th ed), § 44.04, pp 341-342; 82 CJS, Statutes, § 93, pp 154-158.

[49] *Eastwood Park Amusement Co v East Detroit,* 328 Mich 272, 276; 43 NW2d 851 (1950); *Detroit Osteopathic Hospital v Southfield,* 377 Mich 128, 137-138; 139 NW2d 728 (1966); 16 Am Jur 2d, Constitutional Law, § 265, pp 741-745.

[50] 82 CJS, Statutes, § 94, p 162; 2 Sutherland, Statutory Construction (4th ed), § 44.04, pp 341-342.

[51] *Utah Power & Light Co v Pfozt,* 286 US 165, 184-185; 52 S Ct 548; 76 L Ed 1038 (1932); *Champlin Refining Co v Corporation Comm of Oklahoma,* 286 US 210, 234-235; 52 S Ct 559; 76 L Ed 1062 (1932); 82 CJS, Statutes, § 93, p 156.

ments contained in §§ 7(1)(c) and 7(2)(d) and except for failure to provide an exemption for religious institutions. We hold that the parts of the statute held to be invalid, namely, § 7(1)(c), which requires registrants to disclose the identities of persons who contribute to their lobbying organizations, and § 7(2)(d), which imposes similar disclosure duties upon lobbyist agents, may be severed and separated from 1978 PA 472 because the remainder is consistent with the aim of the Legislature to regulate lobbyists, lobbyist agents, and lobbying activities. The parts of the law left intact by our holding may be enforced in a reasonable manner in light of the act as originally drafted.

MCL 4.416(2); MSA 4.1704(6)(2) defines "public official". The definition is amplified in MCL 4.415, subds (9) and (10); MSA 4.1704(5), subds (9) and (10). However, the Secretary of State has not yet published a list indicating those who will come within the definitions. We decline to rule on this issue until he does so.

In applying these legal propositions, we conclude that the parts of the statute which we hold unconstitutional are not such as to require a conclusion that the entire act is invalid and unconstitutional. On the contrary, in accord with what we perceive to be the legislative intention, the remainder of the act is sufficiently independent and complete in itself to be adjudicated constitutional. The invalid and unconstitutional parts are severable, and do not affect adversely the remainder of the act.

Reversed in part, affirmed in part, and remanded.